In the Matter of YALE EXPRESS SYS-
TEM, INC., and subsidiaries,
Debtors.

No. 65 B 404 HRT.

United States District Court,
S. D. New York.

Oct. 11, 1973.

Supplemental Memorandum Nov. 14, 1973.

See also, D.C., 342 F.Supp. 972.

Rogers & Wells, New York City, for trustee.

Kenneth B. Keating, New York City, former trustee.

Simpson, Thacher & Bartlett, New York City, for debtor Yale Express System, Inc.

Duane, Morris & Heckscher, Philadelphia, Pa., for Debenture Holders Committee.

Arthur Friedman, Lake Success, N. Y., for Republic Carloading & Distributing Co., Inc.

McGowan & McGowan, New York City, Sp. Counsel for trustee.

George C. Thompson, New York City, Member, Debenture Holders Committee.

Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, New York City, for Debenture Holders Committee.

Tell, Cheser, Werner & Breitbart, New York City, for Boston Ins. Co.

Zelby & Burstein, New York City, for debtor Yale Transport, Inc.

John M. Friedman, Scarsdale, N. Y., for The Bank of New York, Indentured Trustee.

Olin, Murphy, Manuel & Lynch, New York City, for The Bank of New York, Indentured Trustee.

Charles Seligson, New York City, Sp. Counsel for debtor.

Robert W. Bogumil, Summit, N. J., Member, Debenture Holders Committee.

## OPINION

TYLER, District Judge.

Hearings on "final allowances" in these consolidated reorganization proceedings, 11 U.S.C. § 600 et seq., were held on April 25, May 17, May 24, and

June 11, 1973. The trustee, his counsel and other parties to these proceedings have submitted applications for allowances of fees and expenses, together with post-hearing briefs in support thereof. On July 26, 1973, the Securities & Exchange Commission ("SEC") filed its memorandum analyzing and constructively criticizing the several applications. See 11 U.S.C. § 608. Total allowances sought aggregate $2,677,784.25, of which $633,479.66 have already been paid as interim allowances over the period commencing in May, 1965, when petitions for reorganization were filed in these cases. Finally, reimbursement for expenses is now sought in the total sum of $18,316.64.

## GENERAL

The history of these consolidated reorganization proceedings has been the subject of a number of reported judicial opinions, articles in national magazines and formal reports filed by the SEC. For purposes of background here, it simply need be recalled that Yale Express System, Inc., an integrated transportation firm and the parent corporation of the other companies involved in these proceedings, is regulated by the Interstate Commerce Commission. Yale Express became a publicly owned corporation in 1960. Shortly thereafter, it entered a program of acquisition, the most important fruit of which was the purchase of a freight forwarding firm then known as Republic Carloading and Distributing Co., Inc. ("Republic").[1] Republic proved to be too large and difficult an entity to be swallowed by Yale Express; as a result, Yale Express suffered losses of approximately $1.5 million in 1963 and $4.5 million in 1964. On May 24, 1965, Yale Express peti-

tioned for Chapter X relief in this court. Within a matter of days thereafter, the various subsidiary corporations of Yale Express, including Republic, filed similar petitions.

Kenneth B. Keating was initially appointed trustee of the corporations in reorganization and served in that capacity until December 8, 1965, when he resigned to become a judge of the Court of Appeals of the State of New York. By order of this court, a professional transportation man, F. Ralph Nogg, was appointed successor trustee. Despite several difficult years engaged in rehabilitating and reorganizing the business, the trustee was ultimately successful[2] in reorganizing all phases of the Yale Express operations. One of the significant reorganization steps was that pertaining to Republic, which was effectively reorganized in 1968 by virtue of a sale to an outside group organized and controlled by Lazard Freres. Finally, in 1972, Yale Express, the parent company, and Yale Transport Co., a major operating subsidiary, were reorganized under an internal plan which provided for the satisfaction of all creditors' claims, including post-petition interest and for some participation by common shareholders.

Sections 241 through 243 of Chapter X deal with the persons and firms who may apply for compensation and expenses and define at least in general terms the services that may be considered compensable. Section 241, of course, deals with allowances to the trustee and his counsel. According to the terms of that section, they, as officers of the court charged with specific statutory responsibilities, are entitled to "reasonable compensation." As has been argued by applicants here, success in reorganization, which happily was

---

1. Republic's current corporate name is Republic Freight System, Inc.

2. Some confusion has occurred in these proceedings concerning the phrase "successful reorganization." Counsel for Republic, for example, vigorously asserts that its reorganization has not been successful, meaning that

Republic at present is not as profitable as its management and shareholders would prefer. Obviously, this court, in using the phrase, means something quite different—i.e. that Republic and the other Yale companies technically have achieved reorganization as contemplated by Chapter X.

achieved in these cases, is recognized as a factor to be considered in passing upon final fees and allowances. Scribner & Miller v. Conway, 238 F.2d 905 (2d Cir. 1956).

■ Of some relevance here is the circumstance that allowances for the attorneys for the debtor are also provided for in § 241 of Chapter X. As in the case of the trustee and his counsel, the applications of counsel for the debtor are to be considered in light of the principle that their activities must be of benefit to the estate in order to qualify for any compensation. In re Porto Rican American Tobacco Co., 117 F.2d 599 (2d Cir. 1941).

■ All other applicants here, such as the bond holders committee, indenture trustees and their lawyers, fall within the embrace of §§ 242 and 243. Despite some differences in the language of these sections, both have been consistently construed to also require that the applicants have rendered services which are beneficial to the estates.

■ A cardinal principle to bear in mind in connection with the problems here presented is that Chapter X is an investor protection statute. SEC v. United States Realty & Improvement Co., 310 U.S. 434, at 448–449, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940). Thus, in practical terms, it is the creditors and shareholders, principally of Yale Express and Republic, who will bear the costs of paying these allowances. Obviously, therefore, allowances cannot be paid at the prevailing rates of the private sector; they must be moderate in the interests of the debtors, shareholders and creditors. See Finn v. Childs Co., 181 F.2d 431 (2d Cir. 1950). Moreover, it is axiomatic that allowances must be in satisfactory proportion to services actually rendered and beneficial to the estates. In re Hudson & Manhattan Railroad Co., 224 F.Supp. 815 (S.D.N.Y. 1963). As has been consistently recognized, beneficial services to the estates embrace: (1) services contributing to the plans of reorganization approved by the court; (2) services leading to disapproval of plans rejected as being unfair or economically untenable; and (3) services which aided the administration of the estates. Each applicant before the court, of course, has the burden of proof to establish the beneficence and propriety of his services in terms of the allowances which he seeks. Woods v. City National Bank & Trust Co. of Chicago, 312 U.S. 262, at 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941).

■■ Nevertheless, with due regard to and emphasis upon the first principles of compensation heretofore briefly summarized, it is also true that allowances, particularly in respect to successful proceedings of this kind, should not be niggardly; they should be generous enough to encourage competent lawyers, committees and other entities to render the highly important and useful labors incident to Chapter X proceedings. Delafield, Marsh & Hope v. Silbiger, 228 F.2d 838 at 841 (2d Cir. 1956). Finally, therefore, it is clear that a balance must be struck among the conflicting considerations and interests. Massachusetts Mutual Life Insurance Co. v. Brock, 405 F.2d 429, at 432–433 (5th Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1968). Although something akin to Solomonic wisdom in this balancing operation is desired, this court, as a practical matter, must settle for something less which, nonetheless, factors in the principles heretofore discussed.

Before turning to the underlying issues and the specific claims of each applicant, it is to be noted that this is not a case where there have been many applicants with inadequate time records presented to the court to back up their submissions. Indeed, the most important and sizeable applications have been supported by comparatively specific time and other records. The few exceptions to this will be treated hereinafter. Moreover, the undersigned has presided over these reorganization proceedings in their entirety and thus has the benefit of first-hand knowledge of the work and

services rendered for the last seven years and five months.

## THE ISSUE OF INTEREST CLAIMED ON CERTAIN ALLOWANCE AWARDS

 Two applicants before the court, former trustee Kenneth B. Keating and Royall, Koegel & Wells, Esqs., urge that they be awarded interest at the rate of 6½% per annum on the unpaid portions of their respective allowances. So far as can be ascertained, the particular rate of interest requested is based on the fact that the same interest is being paid to creditors of Yale Express under the plan of reorganization.

Without extended discussion, this court has been unable to find any legal precedent supporting this claim for the payment of interest on so much of the allowances which have not been paid to date. In the view of the undersigned, the absence of any decision supporting this kind of an application is not surprising. To award interest to the former trustee and the counsel for the trustee in a Chapter X proceeding would be anomalous. The two applicants in question were appointed with full recognition that they had no specific claim to any set fees or allowances, either interim or final. They do not stand in the shoes of shareholders or creditors. The estates have not been holding vested sums for them by way of allowances or fees. In short, I conclude that the requirements of §§ 241 through 243 of Chapter X, which contemplate the payment of reasonable compensation for services rendered, would be violated in spirit by the award of any interest for so much of the allowances which have not been paid to date.

In view of this ruling, it is only necessary to briefly refer to an argument of these two applicants based upon a recent decision of the Court of Appeals of the Third Circuit, In re Imperial "400" National, Inc., 456 F.2d 926 (1972). The holding of that case is irrelevant to the problem at hand; there, the court held that applicants who have been overpaid by interim awards should pay interest on refunds of the overpayments. As stated, the estates here have not been holding any vested funds of the two applicants for interest; more precisely, though this court has always held open to applicants the right to claim final allowances, it does not follow therefrom that final allowances had been fixed and set aside as specific sums due and owing applicants. Thus, their claims for interest are rejected.

## THE QUESTION OF ABILITY TO PAY FINAL ALLOWANCES

It is evident that the major portion of the final allowances to be granted will be borne by Yale Express. Hence, its present financial condition should be considered.

For the year ending December 31, 1972, Yale Express had consolidated revenues of approximately $13,052,000. Its operating profit for that year was $525,000. In June, 1973, it had cash or quick assets of approximately $1,044,000 with anticipation, however, of paying some $542,767 worth of claims under the plan of reorganization. At the same time, Yale Express projected additional administration costs of $220,000 and allocated about $325,000 for interest amortization and "working money". The projected cash flow of Yale Express System at this time is about $1,000,000. Yale anticipates spending about $500,000 for capital expenditures for new equipment; fortunately, this capital expenditure is off-set by depreciation expense of about the same amount.

Accordingly, it can be said that Yale Express presently has a positive cash flow of about $500,000. Nonetheless, it is still true that Yale Express must continue to exercise caution in respect to its cash position for the foreseeable future. To some extent, the problem is eased by the fact that the trustee and his attorneys have agreed to accept 10 year, 7% installment mortgage notes. Yet, on

balance, it is perfectly clear that this court cannot ignore the present fiscal position of Yale Express to the point of being unduly liberal in allowances here to be granted.

Although the problem is theoretically less acute for it, Republic, as will be discussed in more detail hereinafter, will have to bear a proportion of the allowances to Mr. Nogg and counsel for the trustee. Thus, this court cannot be insensitive to the current fiscal condition of Republic. According to Republic's president and counsel, that corporation is in bad condition—indeed, in need of further reorganization. The facts of record suggest that this conclusion may be more rhetorical than real. Nonetheless, it is true that Republic, from 1969 through 1972, has shown losses in three of those four years. Moreover, Republic has set aside only $150,000 against the contemplated award by this court of final allowances. Thus, though there are reasons to think that Republic's business prospects are currently better than painted at the hearings and in its counsel's briefs, this court surely must weigh in the balance the fact that Republic so far is not in a strong cash position.

## PREVIOUS ESTIMATE OF ALLOWANCES

Inevitably, there arose occasions in these proceedings when certain parties, particularly the trustee and his counsel, were called upon to and did make estimates of "outside amounts" of final allowances. In early 1969, for example, the trustee and representatives of Royall, Koegel had conversations with the officers and directors of Republic concerning the latter's desire to anticipate what Republic should set aside for its share of additional or final allowances which might be awarded by the court. Indeed, on April 10 of that year, the trustee wrote a letter to the directors of Republic and estimated that the final compensation to him and his counsel for services rendered to Republic up to December 31, 1968 would be approximately $150,000.

In 1972, during the course of the hearings on the final plan of reorganization of Yale Express and Yale Transport, it was estimated by the trustee and his counsel that final awards to the trustee and his counsel probably would not exceed $500,000.

Obviously, as was stressed by several parties in the hearings on the final allowances, the total applications for all applicants—and indeed of the trustee and his counsel alone—far exceed these figures. Even after adjustment for interim allowances and for fees to be paid by Republic, it is apparent that Yale will have to pay more than the $500,000 figure referred to above. Undeniably, this figure was built into the estimated valuation and allocation of securities under the plan of reorganization of Yale Express. Nonetheless, the trustee and his counsel did their best to qualify their estimates as "guessing figures". Further, it was always made abundantly clear that the court, rather than the trustee and his attorneys, would be the institution to make the decision about any final awards.

In hindsight, it is regrettable that these estimates were made as they were. Granted that they are by no means binding upon this court as a legal matter, I have nevertheless used these estimates as a reminder in the balancing operation here necessary so that neither Yale nor Republic are asked to assume responsibility for excessively generous fees.

## INDIVIDUAL APPLICATIONS BEFORE THE COURT

Annexed to this memorandum is a comprehensive table ("Appendix") indicating the total applications of each applicant, any expenses which they are here seeking, their fees or allowances heretofore paid on an interim basis, and the final allowance awarded. Each of these applications, the questions presented thereby and the final rulings of this court thereon will now be discussed.

### 1. *Kenneth B. Keating, Former Trustee:*

██ Mr. Keating, then practicing law in New York City, was appointed the original trustee in these cases on or about June 1, 1965. In November, 1965, he was elected a member of the Court of Appeals of the State of New York; consequently, he resigned as trustee at the close of business on December 7, 1965. Mr. Keating requests a total final allowance of $98,200, of which $80,000 is for the claimed reasonable value of his services for 811.5 hours [3] of time spent on estate matters. The balance of his claim is for the sum of $18,200 for interest at the rate of 6½%. As heretofore indicated, his claim for interest is rejected. In 1966, this court granted Mr. Keating an interim award of $40,000.

Despite his relatively short tenure as trustee, Mr. Keating's contributions in the early months were of prime value. A former United States Senator, member of the House of Representatives and successful practicing lawyer in the State of New York, he lent his reputation and expertise to averting significant problems with customers, suppliers and labor unions. He was also successful in initiating steps to recapture lost business, in starting on the difficult process of collecting aging accounts receivable and in obtaining working capital.

At $80,000 for 811.5 hours, it is apparent that Mr. Keating's application computes out at slightly less than $100 per hour. According to his testimony, in 1965 in the practice of law he was charging an hourly rate of $100. As has been indicated, normal billing rates for a first-rank attorney are not the usual touchstone or guide for compensation as a trustee. The SEC has recommended to the court that the $40,000 already paid to Mr. Keating is sufficient.

With due respect to the reasons for the SEC's suggestion, I conclude that he should be awarded an additional $5,000 in recognition not only of his time and efforts, but of his reputation which did so much to retain and restore confidence of creditors and customers of the companies in reorganization.

### 2. *F. Ralph Nogg, Trustees:* [4]

██ Mr. Nogg served as trustee of the debtors for more than seven years, from December 8, 1965 to February 12, 1973. Except for a period of about nine months when he was employed by REA Express, he was a full-time trustee. Over the years, he has been paid total interim compensation in the amount of $273,405.66. He requests a final allowance of $1,163,600 for slightly in excess of a total of 15,500 hours devoted to the debtors' affairs.

In the opinion of the court, no one deserves more credit than Mr. Nogg for the success of these reorganization proceedings. He is an experienced transportation and trucking executive. More to the point, he is one of those rare individuals who is able to trim surplus "fat" from the operating entities while at the same time encouraging new business and proper morale among employees of those firms. Still further, he was notably successful as a negotiator; as a result of his efforts and talents in that area, a substantial number of large claims asserted against Yale Express and its subsidiaries were reduced, to the benefit of the estates and their shareholders.

Under the guidance of Mr. Nogg, three plans of reorganization were confirmed. First, he negotiated and obtained approval for the sale of American Freight Forwarding Corporation for $405,000. Most important, he achieved

---

3. Originally, Mr. Keating's application was based in part upon 800 hours of recorded time; by letter of September 4, 1973, however, he added 11.5 hours which had been inadvertently omitted.

4. As this opinion was being prepared, Mr. Nogg resigned as trustee. He has been replaced by Caesar Pitassy, Esq., a member of the firm of Royall, Koegel & Wells (now known as Rogers & Wells), who makes no application for an allowance as trustee.

the reorganization of Republic in 1968, by virtue of its sale to a group headed by Lazard Freres. This reorganization effectively eliminated $14.5 million of claims by institutional creditors against Yale Express. Without this step, it would have been impossible to formulate an internal plan to reorganize Yale Express System, including its principal remaining operating company, Yale Transport Co., Inc. His third and final plan of reorganization, as noted, was confirmed by the court in November, 1972 and provided for payment in full of all creditors' claims, with post-petition interest, and some participation by shareholders.

It is apparent that on an annual basis, which seems to be the most sensible and appropriate standard to apply to an operating trustee such as him, Mr. Nogg requests about $160,000 per annum. In the open market and in private affairs, such a sum per annum would adequately reflect the considerable ability and accomplishments of Mr. Nogg as an executive. Nonetheless, it is to be noted that this is considerably more than Mr. Nogg was making prior to the point when this court appointed him trustee. Additionally, the sum of $160,000 is almost certainly more than he would command as chief executive of a company in the business of Yale Express today. The SEC has recommended that a final allowance of $700,000 is reasonable for Mr. Nogg. I am constrained to agree, if only because to award more would pose severe burdens for the reorganized companies, their shareholders and creditors. Accordingly, deducting interim allowances, it is ruled that F. Ralph Nogg is entitled to receive a final payment of $426,594.

### 3. *Royall, Koegel & Wells, Esqs., General Counsel to the Trustee:*

In their detailed submissions to the court, Royall, Koegel & Wells, Esqs. assert that they have devoted a total of 16,727.5 hours to their representation of the trustee in these cases. Of this time, 10,792 hours were spent by associates; 1,262.5 hours by law clerks; and the balance by senior and junior partners. Over the reorganization period, counsel have been paid interim allowances totalling $309,724. They seek additionally the sum of $940,276 for a total of $1,250,000.[5] This total is made up of the following ingredients:

a. All lawyers' time at a "mixed" consolidated hourly rate of $51.51 per hour for a total of $861,573.[6]

b. Interest of 6½% for non-paid allowances amounting to $142,202.73.

c. A reward or premium for results achieved in the amount of $246,222.52.

It cannot be gainsaid that this applicant-firm performed services of a high quality throughout these proceedings. Among other things, counsel consistently advised the trustee in all matters, a not unimportant consideration in light of the fact that Mr. Nogg is not a lawyer. Counsel also played the principal role in obtaining tax refunds from the Internal Revenue Service totalling more than $3.7 million. Not surprisingly, these reorganization proceedings did present certain novel legal issues. Consequently, there were appeals from rulings of this court in at least six cases, and the applicant-firm had to prepare voluminous pleadings, affidavits and make many hundreds of appearances before the reorganization court.

Counsel were active in the negotiations leading to the settlement of the

---

5. In its submission, the SEC recommends that Royall, Koegel & Wells, Esqs. receive total compensation of $784,984.50. Since $309,724 has already been paid, this means that the SEC is suggesting a balance due of $475,260.50.

6. The firm's recommended billing rates, of course, are different for partners, associates and law clerks. Thus, the $51.51 represents the "mixed" or average rate for all categories of professionals. During the relevant period, hourly billing rates of the firm were $70–$150 for senior partners, $50–$95 for junior partners, $25–$75 for associates and $20–$40 for law clerks.

pre-reorganization class actions brought against Yale Express and others, the satisfactory conclusion of which negotiations was of crucial importance to final resolution of these reorganization proceedings. Counsel assisted Mr. Nogg in negotiations of leases relating to the large building and corporate headquarters of Yale Express on 12th Avenue in Manhattan. Counsel were also instrumental in working out with the court somewhat novel procedures for litigation and resolution of those claims against the estates which were not settled by negotiation. Without extended discussion, suffice it to say that the difficulty and diversity of the work required to be performed by this applicant suggests that its claims for time expended are rational and substantially accurate. Moreover, as the SEC has been fair to point out, analysis of the time sheets of this applicant indicates that most of the work was done by four attorneys, and of these, principally by David Bernstein, Esq., a member of the applicant-firm. Among other things, this indicates that the applicant successfully minimized duplication of effort and avoided unnecessary proliferation of legal functions.

■ This court has already ruled that the increment in this final allowance predicated upon interest at the rate of 6½% must be and is allowed. In addition, it is to be noted that no compensation should be awarded to applicant for 390 hours. This is because 270 of these hours were expended on preparing and appearing for fee applications before the court. In addition, the remaining 120 hours of this increment of time were for matters such as conversations and conferences for which there does not appear to be any specific record. Thus, under sound principles heretofore discussed, it is ruled that there will be no compensation for these 390 hours just discussed.

By (1) crediting total time, therefore, as 16,337.5 hours for all lawyers amounting to $861,573; (2) rejecting the claim for interest in the amount of $142,202.73; and (3) factoring in the

"reward" claim of $246,222.52, one can view this claim as totalling $1,107,795.-52, for time spent and results achieved, of which the sum of $309,724 has been paid by interim awards. Viewed in this light, the application works out to an approximate mixed hourly rate of $68 for all classes of lawyers. Certainly, as the law firm argues, this is far from an inappropriate hourly rate on a consolidated basis in the private sector, particularly given the expenses of this type of institutional firm in the City of New York. Parenthetically, I note that, from the statements of income and expenses for Royall, Koegel & Wells in the record, it would appear that the firm's costs per annum approximate 60% of gross revenues.

■ Over the period of the reorganization, this court allowed interim allowances at the approximate rate of $42 per hour as a consolidated rate for partners, associates and law clerks. In the opinion of the undersigned, Royall, Koegel & Wells are entitled to an additional allowance which reflects a higher hourly rate. Nonetheless, it is perfectly clear that notwithstanding their excellent services, this firm is not entitled to the kind of rates which they properly have charged and have been paid in the private sector. This is so even though I agree that the success of the reorganizations, to which this firm contributed considerably, must be and is weighed in this determination. But, as the SEC points out, time records, though an important factor, are not the only basis upon which this court must make a determination of reasonable compensation. Similarly, results achieved cannot be the sole touchstone. Indeed, exclusive emphasis upon the time and accomplishments of the Royall, Koegel firm would result in an award which, though perhaps deserved, inevitably would impose too severe a financial burden upon Yale Express and Republic.

Thus, to balance all considerations heretofore noted, this court concludes that a final award to Messrs. Royall, Koegel & Wells of $816,875.48 and expenses or disbursements of $10,955.52 is

fair and reasonable to embrace services heretofore rendered and any brief closing services which this law firm may have to render in the ensuing weeks. Of that amount, of course, $309,724 has already been paid, leaving a balance due to Royall, Koegel & Wells of $518,107.00, including disbursements.

### 4. *Debenture Holders' Committee and Related Claimants:*

At the time when Yale Express and its subsidiaries went into reorganization proceedings, there were publicly held Yale Express debentures in the principal amount of $6.5 million. Six applications have been made here for final allowances totalling $137,209.25, by the debenture holders' protective committee, two firms of attorneys representing that committee, a single debenture holder and the indenture trustee for the Yale Express 4% convertible subordinated debentures due in 1983. In the opinion of the court, these applications pose several notable difficulties, particularly in that the work of some of these groups was largely unproductive and overlapping. For convenience of discussion, these claimants will be dealt with on an individual basis as follows:

### a. *The Indenture Trustee Claimants:*

The Bank of New York and two of its attorneys make claims here totalling $53,260. The Bank of New York as indenture trustee has requested $11,010 based upon 113 hours of clerical time and 265 hours of officers' time. The law firm of Olin, Murphy, Manuel & Lynch, Esqs., has requested $5,175 for 141 hours of lawyers' time. Finally, John H. Friedman, Esq., of Scarsdale, New York, has made a total claim of $37,075 for 428 hours as special counsel to the bank of New York as indenture trustee. As it concedes, the Olin, Murphy firm has already been paid the sum of $11,010 by the bank. Thus, in effect, the bank seeks reimbursement here for that payment. John H. Friedman has already been paid $25,000 by the bank;

in his application, Mr. Friedman states that he will refund any award in excess of $12,075 to the bank.

It is undeniable that the Bank of New York as indenture trustee had a statutory role in these Chapter X proceedings. On the other hand, it is by no means clear that the many hours of time expended by bank officers and clerical help and by general and special counsel were of corresponding benefit to the reorganization proceedings. In fairness, one exception to this proposition should be noted. The indenture trustee did object to a particular proposed sale of real estate, as a result of which the estate in question was able to obtain a higher price by some $60,000. Also, as the SEC points out, the indenture trustee and its special counsel perhaps should be credited for successfully objecting to a proposed settlement of a debt by set-off even though the debtor in question was not directly benefited in the end result. It is true that John H. Friedman in particular was a continuing participant in many if not most of the hearings. Moreover, this court cannot dispute his claim that he examined the flood of papers which resulted in the many years of proceedings in this case. Finally, this court is well aware of the above average competence of Mr. Friedman as a lawyer in this and other legal matters.

Nevertheless, the crucial difficulty in these applications is the fact that there was an obvious duplication of effort by bank officials and their two sets of lawyers. Therefore, notwithstanding that the Bank of New York has seen fit to pay Mr. Friedman a sum of $25,000 to date for his special attorney's services, I agree with the SEC that an allowance of $16,000 is fair under all the circumstances. Since the Bank of New York has already paid Mr. Friedman more than this sum, I also agree that this allowance should not be paid directly to him but to the Bank of New York by way of partial reimbursement for the fees already advanced by it.

In addition, I find that the amount of time and work by the bank's employees

**1388**

and by the Olin firm was more than necessary under any view of the role of an indenture trustee in proceedings of this kind. Here again, therefore, I accept the recommendation of the SEC and award $10,175 to the Bank of New York to cover both its own employees' efforts and those of the Olin, Murphy firm.

### b. *The Debenture Holders' Protective Committee:*

■■■ Similar problems, plus others, are raised by the protective committee's application for an aggregate allowance of $39,728. According to the committee, its members expended about 1400 hours during these proceedings. Thus, the chairman seeks $40 an hour for 335 hours; three members seek $40 an hour for 405 hours of committee meetings; and a fifth member seeks $25 an hour for 45 hours. Still further, the secretary of the committee requests $10 an hour for 322 hours spent on clerical matters and the same hourly rate for 292 hours of meetings with others.

Particularly in light of the fact that the protective committee retained two law firms to represent it, which firms have submitted significant requests for allowances, I find it difficult to conclude that all of these hours of the various members were particularly necessary or productive for the benefit of either the bondholders or these reorganization proceedings. This is not to say that the committee has been inactive or ineffectual in these cases. Among other things, it has met and discussed prospective plans with their proponents. The committee and its lawyers also developed at least one internal plan. Unfortunately, none of these efforts were successful and thus cannot be said to have benefited the estates.

Happily, the committee did perform useful activities for the benefit of the debtors. To illustrate, it performed a worthwhile service of communication with debenture holders on procedures for filing claims; it also acted as an information disseminating body by sending news letters to debenture holders as the course of these reorganization proceedings unfolded. Certainly also, the committee worked closely and effectively with the trustee on the final internal plan of reorganization of Yale Express, which plan was confirmed by the court in 1972.

Despite the detailed testimony of various committee members and the rather voluminous written submissions during and after the hearings herein, I am unable to conclude that an hourly rate for each of the members is sensible or fair —not only because the time was duplicative and unnecessary, but also because much of the time of the individuals was not beneficial to the estates and the bondholders. As a practical matter, then, the only appropriate solution is to consider the committee and its compensable activities as a whole to determine any fair award. On this basis, I conclude that the committee is entitled to an allowance of $24,220, of which $3,220 should be allocated to the secretary for his clerical efforts. The court leaves it to the committee as a whole to decide how to distribute the remainder of this final allowance among its members.

### c. *Counsel for the Debenture Holders' Committee:*
#### (1) *Duane, Morris & Hecksher, Esqs.*

■■■ As indicated, two law firms appeared for the committee at various stages of these proceedings. Duane, Morris & Hecksher, Esqs., of Philadelphia, contributed the most time and significant efforts for the committee. According to that firm's application, a total of 738.5 hours were expended by partners, associates and law clerks. On a consolidated hourly basis, this works out at something just under $55 per hour for lawyers' time. In the opinion of the court, there can be no doubt that this firm rendered valuable services to the committee in respect to that organization's compensable function. On the other hand, it is clear that a good deal of time of this applicant was devoted to

monitoring hearings and evaluating papers. Still further, there is a certain amount of time for which this court cannot ascribe any particular legal activity at all. The Commission has recommended a final allowance of $29,530 to this firm. Accepting this as a sensible balancing figure, I nevertheless round it off to $30,000 with the direction that it be deemed to include not only final allowances but to include in addition the sum of $1,930.25 for disbursements.

(2) *Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, Esqs.*

 This New York City law firm also performed briefly as counsel to the committee. Webster, Sheffield has requested $2,950, which, for the time claimed to be expended by them, works out to the modest rate of $36 an hour. Under the circumstances, the modesty of this applicant is becoming. Thus, the court has no hesitation in granting this award of $2,950 as prayed.

d. *Robert W. Bogumil:*

 At the outset of these proceedings, Robert W. Bogumil, a debenture holder, was very active as chairman and secretary of a temporary bondholders committee. On at least four occasions,[7] he has submitted a letter to the court seeking an allowance of $840 plus reimbursement for expenses of $160. According to Bogumil, he was instrumental in objecting to contractual arrangements between the debtors and the Denver-Chicago Trucking Co. He also claims to have suggested rescission of the indenture. Whatever the merits of his views, they were not specifically accepted and acted upon. Hence they are not compensable. On the other hand, Mr. Bogumil did perform necessary services as head of the temporary committee which saw to it that notices of these proceedings

and a certain amount of information did flow to the debenture holders in May, June and July, 1965. Accordingly, he is awarded a final allowance of $500, which sum will be deemed to cover his claimed expenses.

e. *McGowan & McGowan, Esqs., Special Counsel to Trustee:*

 McGowan & McGowan, Esqs. of New York City was appointed by the court to represent the estates in the disposition of approximately fifty pre-reorganization tort claims. Ten of these claims were tried on the merits before special masters. Two claims were dropped, and the others were settled by negotiation. McGowan & McGowan claims a total of $20,350, of which $10,350 has already been paid by way of interim compensation. This firm claims to have expended 380.5 hours in performing all of its tasks as stated.

Although this claim of McGowan & McGowan is by no means excessive in terms of amount or hours claimed, the court is disinclined to grant allowances in the total sum prayed.

There are two chief reasons for this court's conclusion that this application should be slightly reduced. First, the award requested works out to the hourly rate of $53.50, which, in comparison with payments to other law firms in these proceedings, is a little more than necessary. Second, there was one litigated matter handled by this law firm which became more lengthy and difficult than required, in part because of the initial conduct of the case by McGowan & McGowan. Without extended discussion this particular case was in fact settled but because of insufficient recordation of that fact on the record, it flared up later as a legal problem. To resolve this legal issue, a considerable expenditure of time and effort by the court, without

---

7. The last two letters were filed after July 26, 1973, when the SEC filed its memorandum on the issues of final allowances wherein it was pointed out that Bogumil technically had not complied with the requirements of Rule X–19 of the Bankruptcy Rules of this court and Sections 62 and 249 of the Bankruptcy Act, 11 U.S.C. §§ 102 and 649. I conclude that Bogumil, who is not a lawyer, has now substantially complied with those requirements.

much assistance from this firm became necessary. For these two reasons, the final allowance awarded to McGowan & McGowan is reduced to $18,350.

### f. Simpson, Thacher & Bartlett, Esqs.:

■ This New York City firm requests an allowance of $3,750 as counsel for the debtors at the time when these proceedings were commenced. It claims an expenditure of 73.0 hours. No one questions the time or sufficiency of the efforts of Simpson, Thacher. Although perhaps not directly relevant to this claim, it is to be noted that Charles Seligson, Esq., of New York City, who actually handled the preparation and filing of the petitions in reorganization, has made no claim for allowances of any kind. This allowance is granted as prayed.

### g. Tell, Cheser, Werner & Breitbart, Esqs., Special Attorneys to Trustee:

■ The Tell, Cheser firm wore two hats in these reorganization proceedings. Here this firm requests $4,675 in connection with its representation of the trustee in defending debtors against casualty claims. This role is not to be confused with its occasional role as retained counsel for an insurance carrier of debtors, Boston Insurance Company. For its proper role as special counsel, this applicant claims 85 hours expended. Concededly, there were no trials or settlements of any litigations involved. In the main, this firm did no more or less than enforce the stay entered by this court against plenary proceedings in various casualty or tort claims asserted against debtors. Certainly, these services were necessary and helpful, but they were not more than routine. The SEC has recommended a final allowance of $3,500. This court determines that a more appropriate award is $3,000.

### ALLOCATION OF ALLOWANCES

Early in these proceedings, in a memorandum opinion filed on April 27, 1966, this reorganization court arrived at a formula charging 55% to Yale Express and 45% to Republic for various expenses, most importantly, interim awards. Not surprisingly, then, the parties attending these hearings on the final allowances consented that the court apply the same allocation formula to final allowances which are keyed to or relate to work substantially done prior to December 31, 1963 when Republic emerged from reorganization.[8]

Somewhat surprisingly, however, none of the parties except the SEC have seen fit to make any precise recommendations about allocation figures. In any event, I have considered the SEC's recommendations; more important, I have endeavored to analyze the hours and the actual work done by the trustee and his counsel for Yale and Republic during the allocation period. As a result, the following allocation determinations are hereby made:

1. For Mr. Nogg as trustee, it has already been indicated that this court determines that he should receive a total allowance of $700,000. Of this amount, Yale Express should pay the sum of $500,780; Republic should pay $199,220. Since Mr. Nogg has already received interim allowances from Yale and Republic, respectively, of $199,356.50 and $74,649.16, it follows that the additional award should be allocated to Yale Express in the sum of $301,423.50 and $124,570.84 to Republic.

2. With regard to Royall, Koegel & Wells, this court has determined that they are entitled to total allowances of $816,875.48. This total amount is here allocated to the extent of $584,392.48 to be paid by Yale Express and $232,483.00 to be paid by Republic. Yale has already been re-

---

8. To an extent, of course, the cut-off date of December 31, 1968, is not entirely precise in that inevitably a small amount of time and work for Republic was necessary for the trustee and counsel after that date.

sponsible for interim allowances of $202,791 for the law firm; Republic has been responsible for the sum of $106,933. Hence, the balances due from Yale Express and Republic, respectively, are $381,601.48 and $125,550 on account of allowances; in addition, Yale Express will be responsible for the disbursements of $10,955.52. It is so ordered.

### APPENDIX

| Applicant | Total Compensation Sought | Interim Amounts Previously Allowed | Total Compensation Allowed | Balance Due |
|---|---|---|---|---|
| Kenneth B. Keating | $ 98,200. | $ 40,000. | $ 45,000. | $ 5,000. |
| F. Ralph Nogg | 1,163,600. | 273,406. | 700,000. | 426,594. |
| Royall, Koegel & Wells | 1,250,000. | 309,724. | 827,831.* | 518,107.* |
| Bank of New York | 11,010. | 0 | 10,175. | 10,175. |
| John H. Friedman | 37,075. | 0 | 16,000.** | 16,000.** |
| Debenture Holders Committee | 39,728. | 0 | 24,220. | 24,220. |
| Duane, Morris & Hecksher | 40,431. | 0 | 30,000.** | 30,000.** |
| Webster, Sheffield, Fleischmann, Hitchcock & Chrystie | 2,950. | 0 | 2,950.** | 2,950.** |
| Robert Bogumil | 840. | 0 | 500.** | 500.** |
| McGowan & McGowan | 20,350. | 10,350. | 18,350.** | 8,000.** |
| Tell, Cheser, Werner & Breitbart | 4,675. | 0 | 3,000.** | 3,000.** |
| Simpson, Thacher & Bartlett | 3,750. | 0 | 3,750.** | 3,750.** |
| TOTALS | $2,672,609. | $633,480. | $1,681,776. | $1,048,296. |

\* Includes $10,955.52 disbursements.
\*\* Includes disbursements.

---

## MEMORANDUM

### Supplemental Opinion

To supplement the opinion of this court dated October 11, 1973, with respect to the final allowances to be awarded in these reorganization proceedings, the following matters are hereby specifically clarified or ruled upon:

As representatives of the Debenture Holders Committee have pointed out to the court,[1] the opinion of the court did not treat that Committee's claim for disbursements in the net amount of $2,744.24. This was because my examination of the papers failed to disclose any detailed recitation of the items that were included in this amount. On or about November 8, 1973, this court received copies of the disbursement items for the Debenture Holders Committee. Furthermore, it is my understanding that the Securities and Exchange Commission has reviewed these disbursements and finds them to be in order. Finally, I note that no interested parties have contested the claimed disbursement items. Accordingly, the Debenture Holders Committee is awarded disbursements in the aforesaid amount of $2,744.24.

Although I had thought the matter clearly resolved during the course of the hearings on final allowances, a question has been raised since the filing of this court's October 11 opinion as to whether or not the allocation between Republic and Yale on the ratio of 45 and 55% pertains to various allowances other than those of trustee Nogg and his attorneys. Accordingly, to clear up any lingering doubt or ambiguity, this court reiterates that all such final allowances which are based upon services rendered during the period when Republic Carloading and Distributing Co., Inc. was in Chapter X proceedings along with the other debtors should be allocated upon the above-stated ratio.

It is so ordered.

1. See letters of November 6 and 9, 1973, from members of the Committee.