In re EREWHON, INC., Debtor.

Bankruptcy No. 81–2038–HL.

United States Bankruptcy Court, D. Massachusetts.

May 4, 1982.

Frederick G. Fisher, Jr., and Kimberly Ryan, Hale & Dorr, Boston, Mass., for debtor.

Widett, Slater & Goldman, P. C., Daniel J. Carragher, Boston, Mass., for Commercial Trading Co., Inc., secured creditor.

## MEMORANDUM ON FEE REQUEST OF COUNSEL FOR SECURED CREDITOR

HAROLD LAVIEN, Bankruptcy Judge.

This issue came before the Court on a fee application filed as a secured claim in this Chapter 11. The application is made by counsel to a secured creditor who bases his secured claim on the loan agreement which provided for payment of reasonable attorney's fees subject to review by the Bankruptcy Court.

Among the unique functions of the Bankruptcy Court is the obligation to authorize post-filing services that are to be attributed to the estate. Regardless of any agreements made prior to the rendering of those services, including agreements for compensation actually approved by the Court. *In re Carter*, 433 F.Supp. 291 (W.D.Mo.1977). The Court must ultimately determine the fair and reasonable compensation for the necessary authorized services rendered by all professionals including not only the administrative functionaries, such as trustees, examiners and their counsel; counsel for the debtor and for the creditor's committee; any appraisers, brokers, auctioneers, accountants, or other experts; but also third parties, such as counsel for the secured creditors whose selection or approval is independent of the court. In short, no one gets paid without Court approval. 11 U.S.C. § 328; *In re Jafco, Inc.*, 3 B.C.D. 774 (Bankr.E.D.Mich.1977).

The Code itself provides very little guidance for the Court. The trustee's compensation is subject to the maximum statutory percentages in 11 U.S.C. § 326. The general provision as to compensation is provided in 11 U.S.C. § 330(a), which provides that compensation shall be "(a)(1) reasonable compensation for actual, necessary services rendered . . . based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and (2) reimbursement for actual, necessary expenses."

The Legislative History to section 330 states that the reference to "the cost of comparable services" in a nonbankruptcy case is not intended as a change of existing law. In a bankruptcy case, fees are not a matter for private agreement. There in-

herently exists a "public interest" that "must be considered in awarding fees." *Massachusetts Mutual Life Insurance Co. v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220. A fee allowance is the result of a balance struck between moderation in the interest of the estate and its security holders and the need to be "generous enough to encourage" lawyers and others to render the necessary and exacting services that bankruptcy cases often require, *In re Yale Express System, Inc.*, 366 F.Supp. 1376, 1381 (S.D.N.Y.1973). "The rate for similar kinds of services in private employment is one element, among others, in that balance. Compensation in private employment noted in subsection (a) is a point of reference, not a controlling determinant of what shall be allowed in bankruptcy cases." S.Rep.No.95–989, 95th Cong., 2nd Sess. 40 (1978), U.S.Code Cong. & Admin.News, pp. 5787, 5826.

While § 330 does not expressly apply to third party counsel, such as a secured lender's counsel, the cases have consistently held that it does apply. *In re Jafco, Inc., supra; In re Boffey*, 14 B.R. 2 (Bkrtcy., S.D.Fla. 1981). The rationale is substantially the same whether one is dealing with a functionary of the Bankruptcy Court or counsel for a secured creditor; namely, that someone other than the secured lender is going to bear the cost; i.e., the estate and the unsecured creditors. When dealing with other people's money, there is apt to be less regard for exercising the same scrutiny of charges that one might render when dealing purely with one's own expenses. The Second Circuit in considering a clause in a mortgage providing for the payment of attorneys' fees has stated that "in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must foot the bills, fail to exercise restraint in enforcement of expenses. While the criticism must, of necessity, be a general one, and it leaves much to the discretion of the trial judge, it does provide a workable standard." *In re Continental Vending Corp.*, 543 F.2d 986, 994 (2nd Cir.

1976); *see also In re G. W. C. Financial & Insurance Services, Inc.*, 8 B.R. 122, 7 B.C.D. 109 (Bkrtcy., C.D.Calif.1981); *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977); "What is reasonable is not subject to easy definition; after analyzing all pertinent elements, the conclusion is a rather subjective finding by the Court." *Kennelly v. Lemoi*, 529 F.Supp. 140, 142 (D.R.I.1981).

■ Clearly, in the area of fees there are no explicit yardsticks. As was stated *In re TMT Trailer Ferry, Inc.*, 577 F.2d 1296, 1304 (5th Cir. 1978), "the court, either trial or appellate, is itself an expert on the question (of attorneys' fees) and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid or testimony of witnesses as to value."

■ While evaluating hours and hourly rates would appear to be an objective task, a first assumption is made that there exists an exact knowledge of the time a particular task did and should take. Fee determination cannot just be a fixed rate times a number of hours, but rather must be a consideration of the overall fairness and reasonableness of the fee under all of the circumstances. *Lund v. Affleck*, 587 F.2d 75 (1st Cir. 1978). The various appellate courts have attempted to make the fee determination as objective as possible by trying to create criteria such as the twelve criteria in *King v. Greenblatt*, 560 F.2d 1024 (1st Cir. 1977), subsequently further amplified and modified in *Furtado v. Bishop*, 604 F.2d 80 (1st Cir. 1979), as further developed in the second *Furtado* case, 635 F.2d 915 (1st Cir. 1980) and, most recently as enunciated by the First Circuit in *Miles v. Sampson*, 675 F.2d 5 (1982). The First Circuit has enunciated the correct application of the "lodestar" fee determination approach as entailing two steps:

First, a "lodestar" fee is determined by multiplying a reasonable hourly rate by the number of hours reasonably expended on the lawsuit. Second, the "lodestar" is

adjusted up or down to reflect factors, such as the contingent nature of success in the lawsuit or the quality of legal representation, which have not *already* been taken into account in computing the "lodestar" and which are shown to warrant the adjustment by the party proposing it." *Miles v. Sampson, supra.* (emphasis added).

Judge Pettine in Rhode Island has discussed in great detail the application of the "lodestar" fee approach in a recent district court case, *Kennelly v. Lemoi*, 529 F.Supp. 140 (D.R.I.1981).

Stripped of all of the verbiage in the final analysis, the trial court makes a subjective determination based on its own general experience of the comparable charges, difficulties, performance, and results of the court's observations not only over its own years of experience dealing almost daily with secured creditors' counsel, their problems in bankruptcy in general, and in Chapter 11 particularly, but also in the manner in which they were handled and paid for in the actual case before it.

As is often the situation in cases of this kind, the worth of such services is difficult to evaluate, and the Bankruptcy Judge is in the best position to determine their value. No doubt the appellant honestly feels that his services as trustee were worth twice the amount awarded to him. *In re Urban Development Co.*, 564 F.2d 808, 810 (8th Cir. 1977).

With the above discussion as a background, an examination of the facts behind this fee application, which was filed as a secured claim, is now in order. On November 10, 1981, Erewhon, Inc., a manufacturer and distributor of natural foods, filed a Chapter 11. At the time, its principal source of financing was Commercial Trading Company (C.T.C.) which had an outstanding inventory loan of approximately $200,000 secured, it thought, by $650,000 of inventory and approximately an $800,000 accounts receivable loan secured, it thought, by $1,100,000 of receivables. C.T.C. had the usual all-inclusive security agreement with clauses covering the proceeds and after acquired property. No one from Erewhon, Inc., or its counsel made any contact with C.T.C. prior to the filing in an attempt to work out the Chapter 11 financing or the right to use cash collateral, although there was no evidence of any previous difficulty or lack of cooperation on C.T.C.'s part. In fact, Debtor's counsel was already preparing its request to use cash collateral five days before the filing of the Chapter 11, having apparently decided on the strategy of hard ball or, at least, surprise. Apparently, on November 12, 1981, somewhat gratuitously, an officer of C.T.C., who had begun to feel uneasy about the account, flew to Boston for a visit where, for the first time, he discovered there was new management in the form of one Mr. Blasberg. The C.T.C. representative felt that Mr. Blasberg was something less than fully informative or cooperative, although he did reveal that the inventory was $500,000 instead of $650,000 and that because of credits not previously reported and shipments still to be made, the actual receivables were $903,000. Mr. Blasberg referred C.T.C.'s representative to his attorney at Hale & Dorr. At that point, quite understandably, C.T.C.'s representative became uneasy about the loan and although as Mr. Schwartz, the C.T.C. vice-president and representative, testified C.T.C. was very conversant with Chapter 11's and had participated in several without counsel, C.T.C. felt the need and, in fact, engaged counsel in the Erewhon matter. That counsel, Stephen F. Gordon of Widett, Slater & Goldman, P.C., is the present claimant. This firm had represented C.T.C. in other unrelated transactions, but it was not until November 12th that it first was engaged relative to the Erewhon problem. The firm was hired to do what was necessary to protect C.T.C.'s interest and help them collect the payment on their debt. Mr. Schwartz testified that C.T.C. engaged counsel, as was their usual practice, on an hourly rate.

In the next four months, the loan was reduced from $1,000,000 to $167,000 and was paid off on April 5, 1982. For his services and those of his associates, counsel at the hearing on April 2, 1982, requested a

fee of $38,128.00 which would include his expenses; however, the present application for fee is for $36,764.56 which includes $1,776.56 in disbursements. At the hearing on April 2nd, the Court ordered $40,000 placed in escrow as part of the payment of the balance due on the loan which was to be fully paid at the closing on April 5, 1982. A hearing on the fee commenced on April 22, 1982, and concluded on April 23rd and, unlike most fee hearings, was a full evidentiary hearing.

Based on all of the evidence, oral and written, submitted at that hearing, the various stipulations filed by the parties in the course of the proceedings, the application for fee, supporting affidavits and time records, and the various hearings involving C. T. C., their counsel, and the Debtor's counsel that took place before me, I make these additional findings. Before beginning this evaluation, I point out that because of the manner in which the time records were presented to the Court, i.e., on a daily basis with all of the day's activities lumped in one paragraph entry instead of by task; it is almost impossible to accurately determine how much time was spent on any particular project in making an evaluation as to whether or not the time spent was reasonable. Therefore, many of the figures that are used in this analysis are the Court's best estimates from the evidence provided. For counsel to say that it makes little difference "since I spent all of that time and my usual rates are $140 an hour," overlooks the statement made repeatedly by our First Circuit, and in fact by every other circuit, that "attorneys should include enough detail so that the Court can determine how much time was spent on particular projects in order to evaluate its worth since not all time is worth the same." *Souza v. Southworth*, 564 F.2d 609 (1st Cir. 1977).

■ The secured claim of C. T. C. was never challenged in any way and was conceded to be valid by the Creditors' Committee and the Debtor after an initial examination unaided by any presentation by C. T. C.'s counsel who, nonetheless, had an associate spend 27.6 hours at $60 an hour researching the question of usury. This would seem to be totally unnecessary work that should not be charged to this Debtor as it was unnecessary at least insofar as the protection of the client's interest in this case. As an incidental matter, the results of that research were not made available to counsel for the Debtor, even though he made such a request at the hearing, because of the claim of attorney-client privilege which might properly have been invoked but would hardly seem to be justified if, in fact, the Debtor is going to be asked to pay the cost. *See In re David Olen*, 15 B.R. 750, 8 B.C.D. 555 (Bkrtcy., E.D.Mi.1981).

■ I find that the Debtor's initial secrecy, its failure to attempt to work out a negotiated basis for financing during the Chapter 11 and its continuing history of losses clearly justified C. T. C. in feeling the need for counsel in this matter, despite their own boasted sophistication in Chapter 11's. They certainly also had the right to choose competent and experienced counsel and there can be little or no question that the counsel chosen was experienced and competent. In point of fact, however, they were always fully secured and although they may have had legitimate doubts and fears, the fact is that the Court never was presented the opportunity to determine whether or not C. T. C. was adequately protected in the use of cash collateral because it was C. T. C. who voluntarily determined that it would not only allow the use of cash collateral but provided additional loans and as part of the initial agreements, allowed the Debtor to retain a portion of the proceeds of a large bulk sale of its security in the form of inventory. In this context, it should be pointed out that C. T. C. not only had the security of the Debtor's collateral but also had the guarantee of the principal stockholders of the Debtor secured by a mortgage on their home which appeared to have an equity in excess of $200,-000. Monday morning quarterbacking is always easier, and of course, C. T. C. did not have the benefit of hindsight on November 12, 1981. The fact is that in the period of five months the loan has been paid in full

and a plan of reorganization has been filed. It is true that in March the Harbor National Bank, which is partially financing the reorganization, would not have made the payoff loan for the remaining $167,000 plus the $40,000 of escrow to cover attorneys' fees without a personal guarantee of the new investor. On the other hand, Harbor National Bank did not have the present stockholders' guarantee and mortgage. I find as a fact that there was never a real possibility that C. T. C. would not get paid in full, even though full payment may have required a total liquidation. In any event, whether or not C. T. C. ultimately would have been paid in full, the services rendered in this case were little other than the ordinary and routine services customarily rendered by a secured creditor's counsel. As a matter of fact, the agreement to allow the use of cash collateral and the bulk sale were decisions made by C. T. C. in spite of its attorney's recommendations.

Mr. Gordon, who testified on behalf of his own fee request, could only testify to three pleadings filed in the Bankruptcy Court; namely, the objection to the use of cash collateral, the motion for compliance and this claim for his fee. Obviously, in preparation of the objection to the use of cash collateral, time had to be spent with the client reviewing the background circumstances, analyzing the financial data that the client could provide, and drafting the actual objection. For experienced and competent counsel, these functions should not have taken more than 12–15 hours including preparation for the hearing, which hearing was aborted when outside of court the parties negotiated and agreed to the use of cash collateral and the ultimate bulk sale. Even though the decisions were the client's, unquestionably there was counsel time spent in the negotiations and in the drafting of the stipulation and security agreements. However, even here the documents were to a large extent redrafts of the original loan agreements, updating the same and dealing with the penciled and penned in requested changes of the Debtor. This should not have required more than a half dozen hours of the senior's time and 10

hours of a junior's time would be generous. Mr. Gordon, who alleges that he bills at the rate of $140 an hour, spent approximately 61.2 hours on this matter from November 12th through December 3rd, which would come to a total of $8,568.00. Mr. Daniel J. Carragher, who billed at the rate of $75 an hour, spent 63.8 hours during the same period for a total of $4,785.00. For the reasons previously set forth, it is difficult from the time sheets to determine exactly how much time each of them spent doing what, but included are such items as time spent researching § 363. Certainly, counsel at $140 or even $75 an hour practicing regularly in this field should not need to spend much time with § 363. There is also time listed during this period in those totals for conferring with Creditors' Committee counsel. While some consultation with the Creditors' Committee counsel may have been necessary, once counsel knew the loan was not going to be challenged, he did not need to be overly concerned with unsecured Creditors' Committee. An examination of the time charges during this period indicates that six attorneys in total charged for varying amounts of time in a situation that has now become very standard and routine under the Code. The Code expressly forbids the use of cash collateral without providing adequate protection, so there really would have been nothing more for Mr. Gordon or any competent bankruptcy counsel to do but to file his simple objection and then sit back and wait and see what, if anything, was being offered as adequate protection since the burden of providing adequate protection is substantially that of the Debtor. Included within this time is a considerable amount of duplication since Mr. Carragher attended court hearings with Mr. Gordon and spent time conferring with him and with other firm attorneys. Obviously, it would be necessary for Mr. Gordon to know what his various associates were doing, but why so many associates? In addition to Mr. Gordon and Mr. Carragher, apparently Mr. Frederic H. Jacobs, who was billing at $110 an hour, spent 10 hours reviewing loan documents included in an additional claim for

some $1,700 of billed time which is divided amongst four associate members of the firm. This excludes the time spent on the researching of the usury problem which would appear to have been 27.5 of an associate billing at $60 an hour or $1,974.

If there was any portion of work in this case that required Mr. Gordon's expertise, it would be the initial phase of the case. However, even here, the deal was actually struck by the client and the legal matters were routine Chapter 11 matters; therefore, just as in a foreclosure action, the attorney should not be allowed his usual rate when a highly qualified attorney was not necessary and may have been over qualified for the tasks at hand. Counsel cannot expect the same fee as they would receive for services requiring special skill, particularly when the person paying is not the client and the lien as such was never really challenged. Counsel's function was merely that of auditing, some limited drafting, and client reassurance. Even as to the last function the client seems in this case to have been exercising its own judgment, and the fees were never a matter of contingency. In achieving the "lodestar" fee both the rate and time might well be revised. However, for convenience, I am simply taking the factors into account in determining a reasonable average rate for the time spent on these particular tasks. A rate of $100 an hour would seem to be more than reasonable which would result in compensation for the 61.2 hours of $6,120. *In re Boffey*, 14 B.R. 2 (Bkrtcy., S.D.Fla.1981); *In re Time Sales Finance Corp.*, 1 B.C.D. 156 (Bankr.E.D.Pa.1974). Mr. Carragher's 63.8 hours is so replete with duplication of Mr. Gordon with their joint attendance at hearings and meetings, that I will allow half the time, namely 32 hours at his alleged customary billing rate of $75 an hour or $2,400 for this phase of the work. It is hard to conceive as to why all the other attorneys were necessary in this rather routine matter and, again, on the likelihood of some undisclosed need for at least some of their services, I will allow them approximately half the time and compensation. I will allow an additional $1,000 for that group.

A dispute developed relative to the bulk sale involving some $17,000, which was ultimately settled on the urging of the Court that counsel were consuming more in fees than the dispute was worth. In fact that warning was borne out when the matter was settled for $5,000 because although it is difficult to separate the specific items of the time, it would appear that these legal efforts resulted in $4,400 worth of billable time. During the period December 12, 1981 to February 15, 1982, Mr. Gordon has billed a total of $4,508 for 32.2 hours, Daniel Carragher has billed 25.6 hours for roughly the same time for $1,920, Ruth Kaplan has billed 23.7 hours at $60 an hour or $1,422 for reviewing various equipment and real estate lease transactions, and Mr. Richard H. Goldman, who bills at $125 an hour, spent one-half hour arranging for a title examination of the Brookline property for $62.50. It is a small item, but Mr. Goldman's billing is typical of the problems in this phase of the case. In order to arrange for a title exam, do you need a person who bills at $125 an hour? During this phase of the case there really was very little that any attorney could be doing to help the client except monitoring the proceedings that were taking place in court or at the Debtor's place of business. The only overt action taken was to resolve the problem of the $17,000. Apparently, during this period the creditor was receiving substantial payments since, by March, the $1,000,000 indebtedness had been reduced to $167,000 which would have been paid with or without counsel except for $600 ($5,000 – $4,400). The fee claimed during this period was approximately $7,912.50. Reasonable compensation for the monitoring and limited enforcement problem would hardly warrant a fee of time and hours in excess of $3,500 to $4,000 and that would be excessive but for the size of the debt and the Debtor's original failure to communicate.

In March, Mr. Gordon seeks $3,528 for 25.2 hours which seem to be largely spent either in monitoring the Debtor's attempts to finance a plan or working on the possibil-

ity of a trustee should payment not be made on April 2 as called for under the stipulation. It is difficult to tell exactly how much time was spent on each specific task during this time because of the way the time sheets are organized, but it would appear that a majority of the time was spent in little more than serving as a messenger as third parties and creditor's committees and others wanted to know what, if anything, C. T. C. would do toward extending terms to them if they were to finance the plan. As to this information, there was no legal work involved and, in fact, Mr. Gordon made it clear that all he did was transmit the various requests to his client for its consideration. This was certainly not the type of activity that required a $140 an hour bankruptcy expert. Mr. Carragher, who was Mr. Gordon's associate and who had worked with him through most of the case, billed only 2.5 hours in March at $75 an hour or $187.50. It would seem that substantially everything that took place in March could have and should have been done by Mr. Carragher at a much smaller cost to the estate. In fact, there is some question as to whether any part or at least a majority of the time spent dealing with third party plans was really a legal function, since any third party proposal had to be transmitted to the client for its consideration. The excessive time probably could have been avoided by simply having the proposal submitted directly to the client. On the assumption that all of this work could have been done by Mr. Carragher but that Mr. Gordon would have to keep his finger on the pulse, I will allow Mr. Gordon two hours and provide for the balance of the time of some 26 hours at Mr. Carragher's rate, or a total of $2,230 for this period.

The time in April was almost entirely devoted to a dispute over counsel's fee and the preparation and defense by Mr. Gordon of the fee. Arrangements had been made to pay C. T. C.'s claim in full and the claim was paid on April 5th with $40,000 being held in escrow for the ultimate determination of Mr. Gordon's fee. It may be that Mr. Gordon can justify attending the April 2nd hearing because until the hearing he did not actually have a copy of the Order that was going to provide for the payment. For that hearing and examining that brief Order, aside from any discussions as to his fee, there should be allowed one hour to one and one-half hours. On April 5th, Mr. Carragher lists 3.5 hours for attending the closing. Those items would seem to be all of the time necessary to be spent in April by the law firm relative to the C. T. C. secured indebtedness. The balance of the time and fee requests in April are the work spent defending the fee claimed by counsel. The total would come to $472.50 as a "lodestar" fee and since this is an allowance at the claimed full rates and involved little more than the routine acceptance of the payment, there is nothing to take into account in computing and allowing the full fee rate of counsel that should warrant any further adjustment.

Mr. Gordon submits 332.6 hours that he claims he and his associates have worked on the case, and he bills at a rate of $140 an hour for 135.4 hours. Of course, a professional can place any value on his time that he chooses and that the market will accept. Certainly, others in the City of Boston make similar or higher hourly charges,[1] but that is only the beginning of the "lodestar" determination.

The Court is charged with the responsibility to make an independent determination of the reasonable necessity of the services and the appropriate charges for said services as they apply not in general terms but to the specific matters before the Court. The Court does this by the application of the "lodestar" approach to fees as set out in the second *Furtado* case, *supra*, 365 F.2d at 916 and most recently restated

---

1. It should be noted that in *Lamphere v. Brown University*, 610 F.2d 46, 48 (1st Cir. 1979) the court stated in a Rhode Island case, ... "We are somewhat surprised that the Court equated the City of Providence with *Boston, a city with* *an unenviable reputation for high costs* ..." (emphasis added). Incidentally, in that case, the Court allowed various rates, the largest of which was $70 per hour.

in the case of *Miles v. Sampson*, 675 F.2d 5 (1st Cir. 1982). This approach has been recognized in bankruptcy and nonbankruptcy litigation in which the courts have pointed out several times that a fee cannot merely be a determination of the time spent multiplied by some hourly rate because not all time is worth the same even when performed by the same attorney. *Souza v. Southworth*, 564 F.2d 609 (1st Cir. 1977). Incidentally, in that case, the court allowed $50 an hour and found $75 an hour excessive. Fifty-five ($55) and $60 per hour was held reasonable in light of the inflation since 1973, though that was probably the limit and the matter was primarily one for the discretion of the trial court. *Lund v. Affleck*, 587 F.2d 75 (1st Cir. 1978). Most recently, Judge Pettine allowed $65 per hour for court time and $60 for non-court time plus a 10% increase because other factors including a substantial award, a contingent fee, two and a half years' delay in getting paid, and a skilled, finished, experienced advocate who represented his client in exemplary fashion, who was thoroughly knowledgeable in the applicable law and learned in trial tactics procedures. *Kennelly v. Lemoi*, 529 F.Supp. 140 (D.R.I.1981). Without further belaboring the point, it should be obvious that an attorney who, for example, has a recognized tax expertise that might justify a high hourly rate when giving tax advice would not be justified in charging the same rate for handling routine matters around the office or for undertaking to personally fly the papers to Washington, D. C., simply to file them with the clerk of the Tax Court. It may be that if the client specifically demanded this personal service and attention, the client should be required to pay for such service but the charge for those services should not be made a portion of the secured indebtedness and fostered on the Debtor or anyone else who was obligated to pay the debt since those would not be reasonable charges necessarily incurred in the protection or collection of the indebtedness.

In the case before us, the applicability of this reasonableness standard is made explicitly clear by the parties in the papers accompanying the stipulations, specifically in the second rider to the Accounts Receivable Agreement dated November 18, 1981 in which paragraph 14 stated "the customer shall pay to the company its out of pocket expenses for travel, lodging and meals incurred by the company in connection with weekly audits performed by the company, together with *reasonable counsel fees of the company, subject to the subsequent review of the Bankruptcy Court*, with such payments to be paid on a monthly basis, in arrears, as billed by the company." (emphasis added). Thus, by explicit agreement of the parties, the customer, the Debtor, was only obligated to pay reasonable counsel fees of the secured creditor subject to the subsequent review of the Bankruptcy Court.

In applying the criteria of *Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980) and in attempting to establish the "lodestar" fee, the Court has considered the time and labor which would have been necessary to protect this secured debt, based on its own expertise dealing almost daily with substantially equivalent problems. Further, there was no particular novelty or difficulty to the questions and no great amount of skill was necessary to perform the legal services properly, since this is a routine matter that occurs in every Chapter 11 where there is a secured creditor and a desire to use cash collateral; i.e., substantially every Chapter 11. The fee was not contingent and the time limitations were certainly not unusual. It is true that the indebtedness was $1,000,-000 and from the point of view of the client the result was extremely satisfactory since in a little less than five months, C. T. C. was paid in full. However, full payment was a matter of the existing security and would have occurred in the normal course of this case, and was not the result of any particular unique experience or ability of the attorneys involved. Certainly, there was nothing undesirable about the case, and this was a client that this firm had dealt with on other matters. There was no evidence that there was anything about this employment that precluded the attorneys from any oth-

er procurement. It is true that the attorney for the Debtor and the attorney for the subsequent lender testified as to their prospective fees in this case. Those fees have not yet been passed upon by the Court, and the Court has taken into consideration its experience in both requests and awards in similar cases. However, I would point out that in the examination of Debtor's counsel, the total time spent by Mr. Frederick G. Fisher and his associates on C. T. C. matters according to their estimates came to some 90 hours. If that time was calculated by including all the records in which C. T. C. was mentioned, and by assuming that all of the time in any such entry was devoted to C. T. C. problems because of the daily record keeping problem discussed earlier, Mr. Fisher's time would have been 65.9 hours and his associate, 105.2 hours as compared to the total time requested in the Gordon bill which was 332.6 hours, despite the fact that the Debtor in the disputes with the secured creditor certainly had a heavier burden.

I would point out in passing that counsel on page 24 of his deposition concedes that even in the nonbankruptcy practice, bills are not necessarily based on a mathematical rate times hours but that other factors enter into the consideration. When counsel for the Debtor was asking questions about excess factors or factors that would entitle the attorney to an amount in excess of the hourly rate, the answer was, "Well, it cuts both ways. Sometimes those factors militate toward a reduction in fee." Ex. 1, Gordon Deposition, at 24.

The question of who is responsible for attorney's fees and in what amounts is generally, at least in the first instance, consensual. Here the original financing agreement of May 9, 1980, provided in paragraph 6 that "(a)ll fees and expenses of any attorney or collection agency employed to collect or sue upon any assigned account shall be charged to and paid by the customer." That clause may not apply since we are not involved in any suit involving the accounts receivable. At the time of the filing of the Chapter 11, on November 10, 1981, there were no attorneys' fees outstanding. Present counsel was engaged after the filing of the Chapter 11 on November 12th and the agreement as to the new financing entered into by the parties and their counsel provided as previously indicated in paragraph 14 for the payment of reasonable attorney's fees subject to the subsequent review of the Bankruptcy Court. I take that clear language to mean that any charges made by counsel, if in fact paid by C. T. C., were only conditionally paid subject to the final determination of the Court as to the reasonableness of the fees, which is translated to mean the fair value of any necessary services. Of course, the client could request and agree to pay for extra or what might be considered to be unnecessary belt and suspenders services, but the secured debt would be paid in full and discharged on payment of principal, interest, expenses, and the Court-approved fees.

Counsel's good faith in his fee request is open to serious question since he testified that at the end of March the total time spent came to $31,000 worth of billable time. The total in bills actually rendered and paid came to some $27,000 and there was allegedly an additional $3,799 that had not yet been billed for the services through March 31. When counsel for the Debtor indicated that he would object to $31,000 as being excessive, counsel then sought to add a 20% factor as a threat to the Debtor and its counsel and, at the April 2nd hearing, the fee was represented to be $38,128 which was the basis for the Court setting aside a $40,000 escrow amount. Subsequently, without waiting to see what allowance this Court would make, counsel for C. T. C. proceeded to initiate foreclosure action on the mortgage and guarantee of the principal stockholder of the Debtor on, apparently, the chance that this Court, which the parties had agreed would pass on the reasonableness of the fee, might consider and allow a smaller allowance. I can only conclude that the combination of the 20% surcharge and the foreclosure were an unconscionable attempt being made to pressure the Debtor into withdrawing its objection

to the fee. I can't help wondering at the devious logic of how a mortgage guarantee of a discharged obligation paid in full can then be in default. Would counsel have the guarantor pay the entire claimed fee while the Court of appropriate jurisdiction which has already created an escrow to insure full and complete payment is in the midst of determining the reasonableness of its fee? Can a note be in default when the course of payment is being controlled by the Orders of a Court of competent jurisdiction and not the voluntary acts of the parties?

■■■■■ Under the American system, "the law imposes on a party the duty to pay his own fees and expenses in vindicating his own personal interest." *United States v. Larchwood Gardens, Inc.*, 420 F.2d 531, 534 (3rd Cir. 1970). In the instant case there is no special statutory authorization for the payment of attorneys' fees. Yet the secured creditor's counsel is requesting that the Debtor not only pay the reasonable attorney's fees to which C. T. C. is entitled to be reimbursed, but the attorney's fees incurred in the Court presentation as to his reasonable compensation. If there is a justification for the American rule that each party should bear their own costs, this would seem to be the perfect illustration of the merit of such a rule. Obviously, counsel was always entitled to a fee. There never was a question of winning or losing, as such. At best, the question was how large that fee should be. Should the estate, and every bankrupt estate is assumed to be financially troubled by definition, be placed under the duress of added costs for trying, in good faith, to ensure that the charges against it are reasonable? The attorney is protected against unreasonable challenges because counsel for the estate will always have to justify the reasonableness of his challenge when his own fees on the matter are considered. In fact, if the Court were, in this case, to apply the secured creditor's logic in seeking compensation to defend his own fee, the estate should be able to charge counsel for the expense to which it was put defending what the Court has in fact determined to be an excessive fee claim. Even under the special statutes which authorize attorneys' fees, such as the Civil Rights Statutes, attorneys' fees are only awarded to the prevailing party, *see e.g., Massachusetts Fair Share v. O'Keefe*, 476 F.Supp. 294 (D.Mass.1979), and if anyone has prevailed in this case, it would be counsel for the Debtor.

It would be inconsistent with the purpose of the Fees Act to dilute a fees award by refusing to compensate the attorney for the time reasonably spent in establishing and negotiating his rightful claim to the fee. (citations omitted) On the other hand, if the attorney's initial claims are exorbitant, or the time spent advancing them unreasonable, the district court should refuse the further compensation. *Lund v. Affleck*, 587 F.2d 75, 77 (1st Cir. 1978).

In this Court's view, the hardest task performed by C. T. C.'s counsel was not protecting C. T. C.'s interests which were never really imperiled, but in the diligence with which counsel has pursued the attempt to justify its own somewhat excessive fee requests. If this procedure were to be sanctioned, the evil would not only be that already mentioned of attempting to intimidate the Debtor from incurring the added expenses, but would almost inevitably father the process of having the secured creditor's counsel always seek excessive compensation on the theory that it would have a built-in pocket for the controversy that would then ensue in its attempt to justify that excessive request. The secured creditor's counsel would take no risk in pursuing the two-fold possibility of, one being able to convince the Court of some justification of the excessive fee and, two, having a built-in client with assured payment for the litigation that would result in attempting to justify that fee. The result would be to the detriment of the bankrupt estate and its creditors without, in any way, improving the position of the secured creditor client who was always entitled to payment in full of its indebtedness and to reimbursement for reasonable compensation due its attorney in protecting its interest. Therefore, no allowance will be made for time spent by

**90**

counsel seeking to justify its own request for an excessive fee.

In order to permit the Court to review the reasonableness of fees, attorneys must submit a detailed description of the time billed. This application may be more detailed than counsel would submit in a billing to a client. However, I would note that Mr. Schwartz of C. T. C. testified that it was his firm's practice to carefully review all legal bills and in this case, the engagement was on an hourly basis. Nevertheless, it would be unfair for the Court to not allow some compensation for preparing the fee application. Again, because of the way the daily time records were presented, it is impossible to determine the exact amount of time spent just preparing the fee application or whether it was prepared by an attorney or paralegal. Further, the determination should be based on the difference in time necessary to prepare the bill for the Court than to prepare a bill for the client. The Court estimates that it should have taken about six hours of paralegal time to assemble accounting records and the petition and two hours of an attorney's time to review. Since it takes little expertise to review a fee application, or to assemble the computerized accounting records, I will allow the attorney's time at $75 per hour and the paralegal time at the submitted rate of $40 per hour, which is probably on the high side, for a "lodestar" fee of $490.00. There is nothing involved in preparing a fee application which should warrant any further adjustment.

Finally, the use of paralegals for routine work in bankruptcy is to be encouraged and in keeping with this memoranda, it is obvious that substantially more of the time in this case could have involved the utilization of paralegals. To the extent that a minimum usage was made, the $824.00 claim for paralegal time of 20.6 hours will be allowed.

In conclusion, based on the above findings, the Court finds that $17,536.50 is the reasonable fee to be allowed plus expenses of $1,776.56.