**In re PENN FRUIT CO., INC., Debtor.**

**Bankruptcy No. 75–1684G.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 23, 1982.

Irving R. Segal, S. Jay Cooke, David S. Hope, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for debtor, Penn Fruit Co., Inc.

Sidney Chait, Adelman Lavine Krasny Gold & Levin, and Lawrence J. Lichtenstein, Philadelphia, Pa., for Official Creditors' Committee.

Jack B. Justice, White & Williams, Philadelphia, Pa., for Northwest Plaza Associates.

I.E. Leinwand, New York City, for Jerome Schottenstein.

Raymond L. Shapiro, Wexler, Weisman, Forman & Shapiro, Philadelphia, Pa., for Girard Bank.

Erwin L. Pincus, Pincus, Verlin, Hahn, Reich & Goldstein, Philadelphia, Pa., for creditors.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issues which confront us in this chapter XI case are: (1) whether a monetary limitation on the costs of administration contained in a debtor's plan which we previously confirmed is non-modifiable and binding upon us; and (2) whether that same plan gives the funder of the plan a right to a refund of $160,000.00 with interest. We conclude that we are not bound by the aforesaid limitation because the court, and the court alone, has the authority to ultimately determine the amount of compensation payable for services rendered in connection with the administration of a debtor's estate. We further conclude that the terms of the plan together with an express agreement made between the funder of the plan, the creditors' committee and the escrow agent for the creditors' committee establish that the funder of the plan has a right to a refund of $160,000.00 with interest.

## I. COSTS OF ADMINISTRATION

■ The facts of the case at bench are as follows:[1] On September 3, 1975, Penn Fruit Co., Inc. ("the debtor") filed a petition

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

for an arrangement under chapter XI of the Bankruptcy Act.[2] An agreement was made between the debtor, the official committee of unsecured creditors ("the committee") and the Ohio Merchandising Corporation ("OMC") and on August 3, 1976, a plan was filed. Article I of that plan provided:

> Article 1. *Cost of Administration.* All costs of administration allowed in these proceedings are to be paid upon confirmation of the Plan of Arrangement, not to exceed the sum of $760,000.

When the filed requests for the costs of administration exceeded the aforesaid maximum of $760,000.00, the committee, in conjunction with the debtor, filed a joint application requesting us to enter an order declaring that the money limitation on "all costs of administration" contained in Article 1 of the plan be declared inapplicable and ineffective. At the hearing on the aforesaid application, no creditor objected to the application with the sole exception of Northwest Plaza Associates ("Northwest"). Northwest does not dispute that the requests for compensation filed by the respective counsel for the committee and the debtor are reasonable and justified but argues, instead, that the $760,000.00 "cost of administration" limitation contained in Article I of the plan is binding and not subject to modification. Northwest contends that we no longer have jurisdiction to determine the validity of the $760,000.00 limitation because we had previously approved the debtor's plan and because we did not otherwise retain jurisdiction with respect to costs of administration. We disagree. It is a fundamental principle of bankruptcy law that "neither creditors nor other parties in interest have the power to bind the court in the exercise of its discretion as to allowances. Creditor consent may, in practice, influence the court and overcome its doubts, but the final word is that of the court and it may disregard the creditors' assent as well as the testimony of expert witnesses." 3A *Collier on Bankruptcy* ¶ 62.05[3] at 1429 (14th ed.1978). In *Wright v. City National*

*Bank & Trust Co.,* 104 F.2d 285 (6th Cir. 1939), the court stated that:

> The order confirming a plan or reorganization *is not the equivalent of a judgment* and is no more than a step in the administration of the debtor's estate *and does not terminate the jurisdiction of the court.* (citations omitted). Allowances to committees, attorneys, trustees and receivers in proceedings under Section 77B of the Bankruptcy Act are made in the exercise of judicial power by the court and the parties cannot, by a provision in a reorganization plan, oust the court of its authority in this respect or relieve it of its duty or responsibility. Any reorganization plan providing, by agreement of parties, for the payment of fees to attorneys or allowances to receivers, trustees or committees in its execution without the approval of the court, is contrary to public policy and void because in direct conflict with the statute [sic] (citations omitted) (emphasis added).

104 F.2d at 287–88.

Similarly, in *Carter v. Woods,* 433 F.Supp. 291 (W.D.Mo.1977), the court held that:

> It being thus determined that the Bankruptcy Court *is not bound by any contingency fee contract that it may have countenanced at some prior point in time,* the issue of the reasonableness of the compensation in fact allowed by the Bankruptcy Court for Appellant's services is still to be resolved (emphasis added).

Finally, in *In re Erewhon, Inc.,* 21 B.R. 79 (Bkrtcy.D.Mass.1982) the court ruled that:

> Among the unique functions of the Bankruptcy Court is the obligation to authorize post-filing services that are to be attributed to the estate. Regardless of any agreements made prior to the rendering of those services, *including agreements for compensation actually approved by the Court* [sic] (*citing Carter v. Woods, supra*) The Court must ultimately determine the fair and reasonable com-

---

**2.** Although the Bankruptcy Act has been superseded by the Bankruptcy Code as of October 1, 1979, the provisions of the Act still govern petitions filed before that date. The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 403, 92 Stat. 2683 (1978).

pensation for the necessary authorized services rendered by all professionals... (emphasis added). 21 B.R. at 80.

■ The *ratio decidendi* for the results reached in the aforementioned cases is that in determining the compensation to be paid for services rendered in the administration of a bankrupt estate, the relevant inquiry must necessarily be whether the compensation ultimately allowed is reasonable compensation within the meaning of Rule 219(c) of the Rules of Bankruptcy Procedure.[3] *Carter v. Woods,* supra, at 293. Consequently, we conclude that we have the authority, pursuant to Rule 219(c), to *ultimately* determine the amount of compensation payable for the services rendered in connection with the administration of the instant debtor's estate notwithstanding the limitation contained in Article I of the debtor's plan. In other words, the court is the final word in granting or denying allowances for costs and services incurred in connection with the administration of a debtor's estate. In that regard, we further conclude that a total compensation of $760,-000.00 for costs of administration would not, under the facts of the present case (which was litigated over a period of seven years), constitute reasonable compensation within the meaning of Rule 219(c) and, for that reason, we declare the $760,000.00 limitation to be ineffective and not binding on the court whose duty it is to fix the compensation of counsel. The fixing of counsel fees is an attribute of the court's "exclusive and non-delegable control over the administration of an estate". *In re B.H. Innes Brown,* 53 Am.B.R. (N.S.) 672.

## II. THE REFUND TO OMC.

■ Northwest next contends that the application of the creditors' committee for an order authorizing the payment of $220,-000.00 to OMC in full settlement of OMC's claim for a refund of $160,000.00 with interest from July 7, 1976, through December 31, 1981,[4] should be denied because the plan itself made no provision for the return of any part of the $160,000.00 deposit and that, therefore, OMC has no right to a refund. Article 3 of the debtor's plan was proposed because everyone,—the debtor, the funder of the plan and the creditors' committee agreed that unsecured creditors should receive a dividend of twenty (20) percent.

Article 3 of the plan provided:

Article 3. *Unsecured Claims.* All unsecured claims of the Debtor are to be paid such percentage of their claims as is arrived at by deducting the amount necessary to pay all secured claims, tax claims, priority claims, administration expenses, Debtor-in-Possession expenses and the amount necessary to obtain title for Debtor to certain store fixtures leased by it from Market Center Fixtures & Equipment Co., from the maximum sum of $13,660,000 or the minimum sum of $13,500,000 as provided in Sub Paragraphs 3(a) and (b) below, which has been provided to fund this Plan of Arrangement and dividing the amount so obtained by the total amount of all unsecured claims filed and allowed by the Court.

(a) The foregoing is intended to obtain for unsecured creditors 20% of their claims provided however that the total obligation to fund the entire Plan of Arrangement shall not exceed $13,600,000.

(b) In the event that the amount necessary to obtain for unsecured creditors 20% of their claims shall not require more than $13,500,000, then the total amount

---

3. Rule 219(c)(1) of the Rules of Bankruptcy Procedure provides that:
   (c) Factors in Allowing Compensation.
   (1) General. The compensation allowable by the court to a trustee, receiver, marshal, attorney, accountant, or other person entitled to compensation for services rendered in the administration of a bankrupt estate *shall be reasonable,* and in making allowances the court shall give due consideration to the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors (emphasis added).
   *See Rules of Bankruptcy Procedure,* Rule 219(c)(1), 11 U.S.C.

4. *See* note 5 *infra.*

deposited to fund the Plan of Arrangement shall be the sum of $13,500,000.

\*   \*   \*   \*   \*   \*

We conclude that a reasonable interpretation of the language contained in Article 3, *supra,* leads to the conclusion that in the event a twenty percent dividend to unsecured creditors would not require more than $13,500,000.00, the $160,000.00 difference between the maximum and minimum deposits would either not have to be paid by Jerome Schottenstein ("Schottenstein"), the funder of the plan and the president of OMC, or returned to him if the actual sum deposited was $13,660,000.00.

This construction is borne out by the facts and circumstances surrounding the actual funding of the plan. Schottenstein had originally paid an aggregate of $13,500,000.00 into the plan whereupon he requested an executed bill of sale and a certification by the escrow agent for the committee of unsecured creditors that the money needed to fund the plan had been deposited. The escrow agent and the committee, however, took the position that before a bill of sale and certification could be delivered, Schottenstein was obligated to deposit the $13,660,000.00 maximum into the plan. This difference between Schottenstein, the committee and the escrow agent was resolved by a letter agreement dated October 7, 1976. That letter, which was signed by representatives of the debtor, OMC, the Merchandising Corporation of Pennsylvania and the escrow agent for the committee of unsecured creditors, provided:

> We are enclosing herewith certified checks aggregating $160,000, made payable to your order as 'Escrow Agent for Unsecured Creditors Committee—Penn Fruit Co., Inc.' These funds are being

made available on the understanding that they be placed in an interest bearing Certificate of Deposit (or Savings Account) to be used to pay the unsecured creditors of Penn Fruit Co., Inc. (Debtor-in-Possession) only in the event that the monies ($13,500,000, plus interest) previously deposited do not provide such unsecured creditors with a dividend of 20% of their approved claims in accordance with the terms and conditions of the Plan of Arrangement of Penn Fruit Co., Inc., filed on August 3, 1976 with U.S. District Court for the Eastern District of Pennsylvania and the underlying Agreement between Penn Fruit Co., Inc., Ohio Merchandising Corporation and Value City, Inc., dated July 30, 1976. *Should this $160,000 deposit or any portion thereof not be needed to obtain for unsecured creditors 20% of their approved claims, it is to be returned to Merchandising Corporation of Pennsylvania forthwith together with any interest earned thereon* (emphasis added).[5]

While Northwest correctly points out that the plan does not expressly provide for a return of any part of the sum deposited, we conclude that to hold that the plan makes no provision for the return of any part of the monies deposited would render the language in Article 3 of the plan pertaining to minimum and maximum deposits and the amount required to achieve a twenty percent dividend meaningless. Moreover, our interpretation of Article 3 of the plan is bolstered by the October 7, 1976, letter agreement which clearly and unmistakeably demonstrates the intent and understanding of the debtor, the funder of the plan and the escrow agent for the committee of unsecured creditors. Consequently, we will approve the committee's application for an

---

**5.** The deposit of $160,000.00 was invested by the escrow agent for the committee in a certificate of deposit and by December 31, 1981, it had increased in value by the accumulation of interest to an amount in excess of $252,000.00. The committee's position was that the interest was payable at the legal rate under Pennsylva-

nia law whereas the funder of the plan contended that he was entitled to a refund of the interest actually earned. A compromise was effected and the committee has made the instant application to this court for an order authorizing the payment of $220,000.00 to

order authorizing the return of $220,000.00 to OMC.[6]

OMC in full settlement of OMC's claim for a refund of $160,000.00 with interest.

6. We have been advised that the eventual distribution to the unsecured creditors will exceed the twenty percent figure provided for in the plan. *See* affidavits of Jerome Schottenstein and John Burke attached to the joint application of the committee and the debtor at ¶ 7 and ¶ 5 respectively.