**In re CENTRAL FOUNDRY COMPANY, Debtor.**

**Walter CROWNOVER, as Trustee of the Estate of Central Foundry Company, Plaintiff,**

**v.**

**MANUFACTURERS HANOVER COMMERCIAL CORPORATION: First Alabama Bank of Montgomery, N.A., Economic Development Administration, Department of Commerce, an Agency of the USA, Defendants.**

**Bankruptcy No. 81–3522.
Adv. No. 83–0786.**

United States Bankruptcy Court,
N.D. Alabama.

Feb. 3, 1984.

**396**

---

Robert P. Reynolds, Tuscaloosa, Ala., for First Alabama Bank of Mont.

Leon F. Kelly, Jr. U.S. Atty., Birmingham, Ala., for I.R.S.

Al L. Vreeland, Tuscaloosa, Ala., for Trustee.

Don B. Long, Jr., Atty. Birmingham, Ala., for Manufacturers Hanover Commercial Corp.

Walter P. Crownover, Tuscaloosa, Ala., Interim Trustee.

Ed Ledford, Chief Counsel, Economic Development Admin., Washington, D.C., for E.D.A.

## MEMORANDUM OPINION

GEORGE S. WRIGHT, Bankruptcy Judge.

The primary issues are: I. Lienholder's right to § 506(b) attorney's fees and expenses; and II. Trustee's right to § 506(c) expenses.

## I. LIENHOLDER'S RIGHT TO § 506(b) ATTORNEY'S FEES AND EXPENSES

### STATEMENT OF PROCEDURE

Manufacturers Hanover Commercial Corporation (M–H) petitioned for authorization for payment of fees, costs and charges, pursuant to § 506(b) of the Bankruptcy Code, incurred through 1/31/82 for $97,264.20 (Document # 93), an amended petition through 3/31/82 for $103,728.94 (Document # 101) and an amended petition through April 30, 1983 for an additional claim of $42,008.72, for a total § 506(b) claim of $145,737.66 (Document # 171).

Objections to the total of these applications were filed by Walter P. Crownover, Trustee (Document # 95 and Document # 111), United States of America on behalf of the United States Internal Revenue Service (I.R.S.) and the Economic Development Administration (E.D.A.) (Document # 106), and Security Engineers (Document # 108).

### MANUFACTURER HANOVER'S CONTENTION

M–H claims $145,737.66 as fees, costs and charges allowable under their "Accounts Receivable Financing Agreement" (M–H Exhibit # 1),[1] and under their "Inventory Security Agreement" (M–H Exhibit # 2).[2]

### FIRST ALABAMA BANK OF MONTGOMERY'S CONTENTION

First Alabama Bank of Montgomery (FAB–M) claims $12,941.08 as § 506(b)

---

1. "6. We shall maintain an account on our books in your name in which you will be charged with loans and advances made by us to you or for your account, and with any other obligations, (as herein defined) including any and all costs, expenses and attorneys' fees which we may incur in connection with the exercise by or for us of any of the rights or powers herein conferred upon us, or in the prosecution or defense of any action or proceeding by or against either of us concerning any matter arising out of, connected with, or related to this agreement or the Accounts assigned hereunder, or any Obligations owing to us by you."

2. "Any and all fees, costs and expenses, of whatever kind and nature, (including any taxes, attorneys' fees or costs for insurance of any kind), which we may incur: in filing public notices; in preparing or filing documents, making title examinations or rendering opinions; in protecting, maintaining, or preserving the Collateral; in enforcing or foreclosing the Security Interest hereunder, whether through judicial procedures arising out of or related to our transactions with you under this arrangement, shall be borne and paid by you. If same are not promptly paid by you, we may pay same on your behalf, and the amount thereof shall be an Obligation secured hereby and due to us on demand."

fees, costs and charges under the Security Agreement dated March 26, 1981 (attached to Claim # 832), which provides:

"The parties to this instrument ... agree to pay all costs of collecting or securing or attempting to collect or secure this note, including the reasonable attorney's fees of the Bank where an attorney is consulted."

## FINDINGS OF FACT

On June 15, 1981, four (4) separate but companion Chapter 11 reorganization petitions were filed as follows:

(1) The Central Foundry Company, BK 81–3522 (hereinafter "Central"),

(2) Quakertown Foundry, Inc., BK 81–3523 (hereinafter "Quakertown"), which is a wholly-owned subsidiary of Central that operated a foundry in Quakertown, Pennsylvania, which plant ceased operations during the pendency of the Chapter 11.

(3) Southeastern Assembly Company, BK 81–3524 (hereinafter "Southeastern"), which is a wholly-owned subsidiary of Central that operated a molded rubber manufacturing plant in Fulton, Georgia.

(4) Fulton Foundry, Inc., BK 81–3525 (hereinafter "Fulton"), which is a wholly-owned subsidiary of Central that owned a closed foundry in South Fulton, Tennessee.

Central, Quakertown and Fulton were converted to a Chapter 7 on December 23, 1981.

## M–H CLAIM

On March 29, 1979, Central obtained an original loan from M–H which carried an interest rate of 3½% above the prime commercial loan rate. This loan was guaranteed by Southeastern and Quakertown and was secured by a properly perfected security interest in:

(a) Accounts Receivable of Central,

(b) Inventory of Central, and

(c) Accounts Receivable of Southeastern.

The loan was paid down from the original $9,000,000 to some $570,000, at the time of the petition. Claim # 214 in Central and # 15 in Southeastern were filed on November 24, 1981 for $648,587 plus *"fees, costs and charges ... as authorized by 11 U.S.C. § 506(b)*, so that M–H is claiming $145,737.66 under § 506(b). The § 506(b) claim is summarized as follows:

| Expert Witness Fees and Expenses: | Through 1/31/82 (#93) | Through 3/31/82 (#101) | Through 4/30/83 (#151) |
|---|---|---|---|
| Rives & Peterson | | | $1,530.90 |
| Benjamin F. Harrison | $5,978.00 | $5,978.00 | |
| Philip Pollock & Company, Inc. | 3,978.00 | 3,622.96 | |
| Peat, Marwick, Mitchell & Company | 14,400.00 | 14,400.00 | 1,453.00 |
| | $24,000.96 | $24,000.96 | |
| **Attorneys' Fees:** | | | |
| Hansell, Post, Brandon & Dorsey | $4,002.15 | $3,901.78 | $4.52 |
| Johnston, Barton, Proctor, Swedlaw & Naff | 52,047.00 | 55,686.92 | 10,122.66 |
| | $56,049.15 | $59,588.70 | |
| **Out-of-Pocket Expenses:** | | | |
| Michael Cleary, General | $2,648.36 | $2,648.36 | |
| Audit Staff | 5,955.86 | 5,955.86 | |
| Wayne Door, Vice President | 1,986.31 | 1,954.81 | |
| Vernon Woods, Vice President | 174.77 | 174.77 | |
| Postage | 440.91 | 440.91 | |
| | $11,206.21 | $11,174.71 | |
| Interest | 6,007.88 | 8,964.57 | $28,897.64 |
| Total: | $97,264.20 | $103,728.94 | $42,008.72 |
| GRAND TOTAL: | | | $145,737.66 |

M–H had the following security available to pay their indebtedness of $570,000:

| | 6/15/81—Date of Filing— Book Value | 12/31/81—Date of Conversion to Ch 7— Book Value | 8/15/83—Date of Submission on question of § 506(b) and § 506(c)— Actual Value |
|---|---|---|---|
| (a) Accounts Receivable of Central [3] | $1,600,000 | $1,400,000 | |
| | | | $1,787,659.26 |
| (b) Inventory of Central [3] | 2,100,000 | 2,000,000 | |
| (c) Accounts Receivable of Southeastern [4] | $ 380,000 | $ 490,000 | $ 331,776.57 |
| | $4,080,000 | $3,890,000 | $2,119,435.83 |

## FAB–M CLAIM

FAB–M held a properly perfected second security position to M–H in the following:

(a) Accounts Receivable of Central, and

(b) Inventory of Central.

3. On June 15, 1981, Central was authorized to use the accounts receivable and inventory collateral, whereupon replacement accounts receivable and inventory were made subject to the lien of M–H as part of adequate protection (Document # 3).

4. All of the assets of Southeastern were sold to U.S. Pipe for $1,125,000 (with adjustments), so that the net value of the stock to Central (the parent) *after the payment of all creditors of Southeastern in full* would be $328,990.21. It is to be further noted that Southeastern guaranteed the obligation to M–H.

FAB–M filed a claim (Claim # 832) for $319,720.82. FAB–M also claimed $12,941.08 for attorney fees in collecting such $321,361.78.

## PAYMENT OF PRINCIPAL AND INTEREST IN FULL

After conversion on December 23, 1981, M–H was paid $665,000 ($570,000 principal and interest in full) on April 5, 1982 and FAB–M was paid $321,361.78 on May 6, 1982 by the Trustee from funds obtained from the liquidation of accounts receivable and inventory.

## DISCUSSION OF LAW

Section 506(b) specifically limits a secured creditor to "any reasonable fees, costs, and charges provided under the agreement under which such claim arose."

In *In re Banks*, 31 B.R. 173, 9 BCD 1413, 1417 (N.D.Ala.1982), this writer set out:

In determining reasonable attorney's fees within the 5th Circuit and now 11th Circuit, the three-step process enunciated in *In re Golf Corp.*, 639 F.2d 1197 (5th Cir.1981), must be followed. This procedure includes the consideration of the twelve factors as enumerated in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–719 (5th Cir.1974). See *In re First Colonial Corp. of America*, 544 F.2d 1291, 1298 (5th Cir.1977), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed. 388 (1977); *In re Scarboro*, 13 B.R. 439 (D.C.M.D. GA 1981).

■ Analyzing the instant case, the first step, i.e., nature and extent of the services, has been claimed in the three separate applications for a total of $145,737.66. The second step requires that the value of these services be determined. Section 506(b) and *First colonial*, supra, requires that the Court determine that the fees are reasonable.

As pointed out above, M–H had as of June 15, 1981, (Chapter 11 filing date) $4,080,000.00 in book value as collateral for a loan of $570,000.00. On December 23, 1981, (the date of conversion from Chapter 11 to Chapter 7) M–H had a book value of $3,890,000.00 as collateral to secure the $570,000.00 loan. Finally, on August 15, 1983, which was at a hearing on the question of § 506(b) and § 506(c), the actual recovered value which secured the M–H loan was $2,119,435.83. The Court finds that there was never any doubt from the beginning that M–H's $570,000.00 loan would be paid. In a similar case, *In re Erewhon, Inc.*, 21 B.R. 79 (Bkrtcy.D.Mass. 1982), the Court, in a long and extended opinion, set out the standards for determining reasonableness. The Court stated:

I find as a fact that there was never a real possibility that C.T.C. would not get paid in full, even though full payment may have required a total liquidation. In any event, whether or not C.T.C. ultimately would have been paid in full, the services rendered in this case were little other than the ordinary and routine services customarily rendered by a secured creditor's counsel.

.     .     .     .     .

Under the American system, "the law imposes on a party the duty to pay his own fees and expenses in vindicating his own personal interest." *United States v. Larchwood Gardens, Inc.*, 420 F.2d 531, 534 (3rd Cir.1970). In the instant case there is no special statutory authorization for the payment of attorneys' fees. Yet the secured creditor's counsel is requesting that the Debtor not only pay the reasonable attorneys' fees to which C.T.C. is entitled to be reimbursed, but the attorney's fees incurred in the Court representation as to his reasonable compensation. If there is a justification for the American rule that each party should bear their own costs, this would seem to be the perfect illustration of the merit of such a rule. Obviously, counsel was always entitled to a fee. There never was a question of winning or losing, as such. At best, the question was how large that fee should be. Should the estate, and every bankrupt estate is assumed to be financially troubled by definition, be placed under the duress of

added costs for trying, in good faith, to ensure that the charges against it are reasonable? The attorney is protected against unreasonable challenges because counsel for the estate will always have to justify the reasonableness of his challenge when his own fees on the matter are considered. In fact, if the Court were, in this case, to apply the secured creditor's logic in seeking compensation to defend his own fee, the estate should be able to charge counsel for the expense to which it was put defending what the Court has in fact determined to be an excessive fee claim. Even under the special statutes which authorize attorneys' fees, such as the Civil Rights Statutes, attorneys' fees are only awarded to the prevailing party, see e.g., *Massachusetts Fair Share v. O'Keefe,* 476 F.Supp. 294 (D.Mass.1979), and if anyone has prevailed in this case, it would be counsel for the Debtor.

> It would be inconsistent with the purpose of the Fees Act to dilute a fees award by refusing to compensate the attorney for the time reasonably spent in establishing and negotiating his rightful claim to the fee. (Citations omitted) On the other hand, if the attorney's initial claims are exorbitant, or the time spent advancing them unreasonable, the district court should refuse the further compensation. *Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir.1978).

In this Court's view, the hardest task performed by C.T.C.'s counsel was not protecting C.T.C.'s interests which were never really imperiled, but in the diligence with which counsel has pursued the attempt to justify its own somewhat excessive fee requests. If this procedure were to be sanctioned, the evil would not only be that already mentioned of attempting to intimidate the Debtor from incurring the added expenses, but would almost inevitably father the process of having the secured creditor's counsel always seek excessive compensation on the theory that it would have a built-in pocket for the controversy that would then ensue in its attempt to justify that excessive request. The secured creditor's counsel would take no risk in pursuing the two-fold possibility of, one being able to convince the Court of some justification of the excessive fee and, two, having a built-in client with assured payment for the litigation that would result in attempting to justify that fee. The result would be to the detriment of the bankrupt estate and its creditors without, in any way, improving the position of the secured creditor client who was always entitled to payment in full of its indebtedness and to reimbursement for reasonable compensation due its attorney in protecting its interest. Therefore, no allowance will be made for time spent by counsel seeking to justify its own request for an excessive fee.

At 21 B.R. 84, 89.

There, the Court allowed a reasonable fee of $17,536.50 plus expenses of $1,776.56 to collect a $1,000,000.00 loan (i.e., 1.75% of the loan amount).

Here, there was never any doubt that M–H would have been paid in full. The Court is of the conclusion that a claim for $145,737.66 to collect $570,000.00 (with interest up to $665,000.00), which was, in fact, paid on April 5, 1982, is unreasonable. The Court reserves determination of subsequent fees until the *actual* rather than *projected* figures are known. M–H claims out-of-pocket expenses for the staff of M–H and attempts to charge the debtor for such expenses. The Court is aware that certain of these out-of-pocket expenses were reimbursements for expenses of employees of M–H to attend hearings, however, the Court is also aware that the loan carried an interest rate of $3\frac{1}{2}\%$ above the prime commercial loan rate of M–H. Surely, the use of employees of M–H and their expenses are already included and are being paid for by the $3\frac{1}{2}\%$ in excess of prime. M–H testified that their employees, in effect, went on "Central's payroll" on date of filing of Chapter 11 by charging all subsequent expenses to Central.

■ As to the third step, the Court considers the twelve *Johnson* factors as follows:

1. *Time and labor required.* The Court determines that some of the services were required to protect the rights of a secured creditor. However, the court considers that the secured creditor's position was never attacked, but, to the contrary, it was always recognized and in fact, the principal with interest was paid in full some four months after conversion. Some of the staff and employee overhead cannot justifiably be charged against the debtor. Some $15,853.00 was charged by Peat, Marwick, Mitchell & Company, which services were rendered primarily to do an analysis of the debtor as a going concern under a Chapter 11. A large part of this function was to advise M–H as to the feasibility of a Chapter 11 (which was converted some six months after initial filing).

2. *The novelty and difficulty of the questions.* As in every large Chapter 11, the questions are always novel and difficult, even though the creditor was fully secured.

3. *The skill to perform the legal service properly.* An attorney in a large Chapter 11 must have the highest skill in all of bankruptcy practice.

4. *The preclusion of other employment by the attorney due to acceptance of the case.* The Court finds that the lawfirm was not precluded from accepting other employment.

5. *The customary fee.* The Court finds that the hourly rate of charge for all of the attorneys in the firm of Johnston, Barton, Proctor, Swedlaw & Naff is reasonable and proper.

6. *Whether the fee is fixed or contingent.* This was a fixed fee being charged as a part of the costs of collection, and not contingent.

7. *Time limitations imposed by the client or other circumstances.* The Court finds that there were, in fact, time limitations due to the rapid movement and demands of a Chapter 11 petition, which required numerous hearings, etc.

8. *The amount involved and the results obtained.* M–H was owed $570,-000.00 and paid with interest $665,000.00. The results were good insofar as M–H's collecting on its collateral.

9. *The experience, reputation and ability of the attorneys.* The firm of Johnston, Barton, Proctor, Swedlaw & Naff is one of the leading and outstanding lawfirms in Birmingham, and, in fact, the State of Alabama.

10. *The undesirability of the case.* This case is not undesirable.

11. *The nature and length of the professional relationship with the client.* The lawfirm had no prior professional relationship with the client.

12. *Awards in similar cases.* The case of *In re Erewhon, Inc.,* supra, allowed a $17,536.50 fee for collecting a $1,000,000.00 loan (1.75%). In *In re American Metals Corp.,* 31 B.R. 229, 9 C.B.C.2d 168 (Bkrtcy. Kan.1983), a similar Chapter 11 conversion case with much more opposition for collecting a similar amount of $638,159.49 principal, the court allowed $37,816.25 (5.93%) as attorney fee, $744.75 as appraisal fee (.117%) and $498.85 (.078%) as attorney expenses. Here, the lawfirm is attempting to collect $69,711.36, plus interest and other expenses totaling $145,737.66 ($107,875.45 plus interest of $37,862.21 for 18.9%). In contrast, FAB–M is claiming as § 506(b) compensation $12,941.08 to recover $319,-842.27, or a total of 4.0% on a second security position with much more danger of nonpayment.

## CONCLUSION

■ The Court, therefore, finds that the following fees are considered reasonable under § 506(b):

| | |
|---|---|
| Rives & Peterson | $ 1,530.90 |
| Benjamin F. Harrison | 5,978.00 |
| Philip Pollock & Company, Inc. | 3,622.96 |
| Peat, Marwick, Mitchell & Company | 7,726.50[5] |
| Hansel, Post, Brandon & Dorsey | 3,906.30 |
| Johnston, Barton, Proctor, Swedlaw & Naff | 35,000.00 |
| | $57,764.66 |

Interest accrues on out-of-pocket expenses from date of payment by M–H and attorneys' fees from date of submission (8/15/83) at the contract rate until paid by the Trustee.

## II. TRUSTEE'S RIGHT TO § 506(c) EXPENSES

Trustee filed a Complaint and Amended Complaint to recover necessary costs and expenses under § 506(c) [AP # 83–0786]; M–H and FAB–M both filed an Answer and Amended Answer and Motion for Summary Judgment.

Trustee claims sale and preservation expenses in accordance with the following Chart # 1:

---

5. Only 50% of claim allowed due to fact that considerable time was an audit of secured parties' account with debtor, that $175 per hour was claimed for accountants, that considerable time was spent in analyzing projections, etc.

CHART #1

ASSETS, EXPENSES AND § 506(b) AND § 506(c) CLAIMS

| | Accounts Receivable & Inventory (A.R. & I.) | | Equipment, Buildings & Land (E.B. & L.) | | Total |
|---|---|---|---|---|---|
| **ASSETS** | $1,787,659.26 (37.54%) | | $2,974,644.57 (62.46%) | | $4,762,303.83 (100%) |
| **EXPENSES** | | | | | |
| Direct—§ 506(c) [6] | 18,772.50 | | 138,910.79 | | 157,683.29 |
| General Operating [7] | 235,684.24 | | 329,137.38 | | 627,821.62 |
| Total | 254,456.17 | | 531,048.17 | | 785,504.91 |
| **CLAIMS** | | Claim (C) or Docket (D) Number | | Claim (C) or Docket (D) Number | |
| **M–H** | | | | | |
| Principal | $665,000.00 (37.20%) [8] | C. 214 | | | |
| +506(b) | 145,737.66 | D. 93, D. 101, & D. 151 | | | |
| −506(c) | 99,471.99 | AP 83–786 | | | 99,471.99 |
| **Economic Development Adm. (E.D.A.)** [9] | | | | | |
| Principal | | | $2,163,120.00 | C. 193 | |
| +506(b) | | | – | | |
| −506(c) | | | 124,318.38 | AP 83–786 | 124,318.38 |
| **FAB–M** | | | | | |
| Principal | 319,720.82 (17.89%) [8] | C. 832 | 2,332,989.00 | C. 974 | |
| Paid 11/12/82 | | | 1,301,795.45 | D. 129 | |
| +506(b) | 12,941.08 | C. 832 | 110,535.74 | D. 149 | |
| −506(c) | 47,837.47 | AP 83–786 | 406,729.79 | AP 83–786 | 454,567.26 |
| **Trustee** | 802,816.39 (44.91%) [8] | | | | |

The Trustee contends that the direct § 506(c) expenses of $18,772.50 should be charged to the lienholders (M–H and FAB–M) of the accounts receivable and inventory.

6. 3 Collier on Bankruptcy, ¶ 506.6 at 506–43 (15th ed. 1983) defines such expenses: "Such costs and expenses as appraisal fees, auctioneer fees, advertising costs, moving expenses, storage charges, payroll of employees directly and solely involved with the disposition of the subject property, maintenance and repair costs, and marketing costs, would generally be found to relate to preservation or disposition and benefit the holder of the secured claim.

7. 3 Collier on Bankruptcy, ¶ 506.6 at 506–44 (15th ed. 1983) defines general administrative expenses: "To illustrate, general administrative costs, overhead, the statutory commissions of the trustee and attorneys' fees of the estate ..."

8. A.R. & I. recovery of assets is allocated: M–H is 37.20%, FAB–M is 17.89%, and Estate is 44.91%.

9. EDA had a superior position in the machinery and equipment and a first mortgage on other collateral, but FAB–M and EDA agreed to a consent order on June 11, 1982 (D. 129) subordinating EDA's position to FAB–M. On November 12, 1982, the Trustee sold at auction some of Equipment, Buildings and land of Central free and clear of liens for $1,725,000 to EDA (EDA paid $1,301,795.45 direct to FAB–M as first mortgage holder and $423,204.55 to the Trustee). EDA expressly consented to the charge of "reasonable and necessary administrative expenses incurred in the care and preservation of the property." (AP 82–1567, D. 16).

The Trustee also contends that the pro-rata (based upon allocation between Accounts Receivable and Inventory of 37.20% of total assets) part of total general operating expenses (for a total of $235,684.24) should be charged to M–H and FAB–M as the Trustee continued to have employees who packed and shipped the inventory—all for the benefit of M–H and FAB–M.

The Trustee also contends that an oversecured creditor must pay the pro rata share of the § 506(c) preservation and sale expenses as a direct offset against § 506(b) claims for interest, attorney fees, etc., as § 506(b) specifically provides "after any recovery under subsection (c) of this section." In support, the Trustee cites *In re Elmwood Farm, Inc.*, 19 B.R. 338 (Bkrtcy.S.D. N.Y.1982), where one OVERsecured creditor was charged with $25,359.07 § 506(c) expenses, representing his pro-rata (66%) share of the total secured claims, which was offset against his § 506(b) recovery. See also 3 Collier on Bankruptcy, ¶ 506.6 at 506–43 (15th ed. 1983).

## § 506(c) AND LEGISLATIVE HISTORY

§ 506(c) provides:

> (c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Congressman Don Edwards [10] and Senator DeConcini [11] made the identical statement on final passage of § 506(c):

> Section 506(c) of the House amendment was contained in H.R. 8200 as passed by the House and adopted, verbatim, in the Senate amendment. Any time the trustee or debtor in possession expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the trustee or debtor in possession is entitled to recover such expenses <u>from the secured party</u> or from the property securing an allowed secured claim held by such party. (Underlining for emphasis)

The identical language is contained in the House Report [12] and Senate Report: [13]

> Subsection (c) also codifies <u>current law</u> by permitting the trustee to recover from property whose value is greater than the sum of the claims secured by a lien on that property that reasonable, necessary costs and expenses of preserving, or disposing of, the property. The recovery is limited to the extent of any benefit to the holder of such claim. (Underlining for emphasis)

Unfortunately "present or current law" at the time of the enactment of § 506(c) was confused, muddled and befuddled.[14] Under the pre-code law, the annotation "Imposition upon lien creditor of expenses, other than referee's and trustee's commissions, attributable to bankruptcy sale free from liens," 48 ALR2d 1343 (1956), set out nine equitable factors and principles on whether to impose expenses on the lien creditor. There are two basic conflicting principles which the courts have wrestled with:

(1) A lien creditor should not have to pay for any expenses in disposing of his collateral.

(2) The unsecured creditors should not be charged with the expenses of protecting

**10.** Congressional Record, House, September 28, 1978, H. 11095

**11.** Congressional Record, Senate, October 6, 1978, S. 17411

**12.** Report of the Committee on the Judiciary, House of Representatives, H.R. 8200, H.R.Rep. 95–595, p. 357, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6312.

**13.** Report of the Committee on the Judiciary, Senate, S.Rep. No. 95–989, p. 68, U.S.Code Cong. & Admin.News 1978, p. 5854.

**14.** 4B Collier on Bankruptcy, ¶ 70.99 at 1225 (14th ed. 1978). See Levy and Bottlieb, "Allocation of Expenses of Preservation and Sale of Liened Property," 86 Comm.L.J. 356 (Oct. 1981); Note, "Allocation of expenses incurred in a Bankruptcy sale free of liens," 27 J. of Nat. Assoc. Ref. in Bankruptcy 115 (1953); Oldham, "Sales of property free and clear of liens and the right to tax the costs against the mortgagee," 28 J. of Nat. Assoc. of ref. in Bankruptcy 88 (1954); Annot., "Imposition upon lien creditor of expenses, other than referee's and trustee's commissions, attributable to bankruptcy sale free from liens," 48 A.L.R.2d 1343 (1956).

and liquidating the collateral which is not theirs.

These two conflicting principles have made the prior law unclear so that when the legislative history and table of derivations refer to adopting the prior law, courts are again left with a difficult determination as to what the Congressional intent now mandates.

Table of Derivations of H.R. 8200, 95th Cong., 1st Sess. Committee Print No. 6 (1977) indicates that *Textile Banking Co. v. Widener*, 265 F.2d 446 (4th Cir.1959) was the "present law." There, Textile Banking was owed $72,000 secured by collateral sold by the Trustee, over objection of Textile, for $62,737.50. Textile Banking was clearly undercollateralized (even though Textile Banking was able to recover against a $30,000 deposit of funds of a guarantor). The court disallowed any claim for *general administration expenses* (i.e., Trustee's commission and other costs), but allowed a claim for the actual *selling* and *preservation* expenses of $3,775.92— *limited* to the *costs in state court* if Textile Banking were allowed to pursue their remedy in state court (upon facts the limitation was inapplicable).

Any § 506(c) recovery can be divided into three separate situations:

(1) Where the collateral is liquidated for an amount less than the principal amount owed [the UNDERSECURED situation]; or

(2) Where the collateral is liquidated for an amount greater than the principal owed, but insufficient to pay in full the § 506(b) interest and other reasonable fees, costs, or charges [the PARTIALLY UNDERSECURED situation]; or

(3) Where the collateral is liquidated for an amount greater than the principal owed, and also any § 506(b) interest and other reasonable fees, costs, or charges [the OVERSECURED situation].[15]

*Textile Banking*, supra, falls into situation # 1, so that the legislative intent is unclear as to situations # 2 and # 3. The legislative history of both the House and Senate, upon final debate, indicates that the trustee is entitled to recover his sale and preservation expenses *"from the secured party* or from the property securing the allowed secured claim held by such party."* This legislative history of collectibility "from the secured party or" seems to indicate that the trustee can look and charge such expenses against the creditor and not just look to the collateral (i.e., property securing the allowed secured claim). Under pre-code law, some courts, particularly in the 5th Circuit, made a total distinction upon whether or not the claim was oversecured or undersecured.[16] Thus, the legislative history appears to be inconsistent with the plain language of the statute.

The Court has two difficult choices in interpreting the Congressional meaning of § 506(c):

**15.** The following hypothetical illustrates the three situations:

| | CHARGES | UNDERSECURED #1 | PARTIALLY UNDERSECURED #2 | OVERSECURED #3 | |
| --- | --- | --- | --- | --- | --- |
| | | | | SECURED PARTY'S CONTENTION | TRUSTEE'S CONTENTION |
| Collateral Liquidation | | $8,000 | $10,000 | $12,000 | $12,000 |
| Claim Principal | $9,000 | 7,500 | 9,000 | 9,000 | 9,000 |
| § 506(b) Interest, fees, etc. | 1,000 | | 500 | 1,000 | 1,000* |
| § 506(c) Preservation and Sale expenses | 500 | 500 | 500 | 500 | 416.67* |
| Estate | | 0 | 0 | $ 1,500 | $ 2,416.67* |

\* Under the Trustee's contention, in the oversecured situation #3, the secured creditor would be charged with the pro-rata share ($10,000/$12,000) or 83.33% of total recovery of the § 506(c) Preservation and Sale expenses of $500 which is $416.67. This would be subtracted directly from the secured creditor's claim [principal of $9,000 and § 506(b) interest fees, etc. of $1,000] so that the secured party would recover $9,583.33 in lieu of $10,000, thus increasing the recovery to the Estate from $1,500 to $2,416.67.

**16.** *Reconstruction Finance Corp. v. Rhodes*, 214 F.2d 606, 48 A.L.R.2d 1339 (5th Cir.1954); *Op-* penheimer v. Oldham, 178 F.2d 386 (5th Cir. 1949); *New Orleans v. Harrell*, 134 F.2d 399 (5th

(1) Read § 506(c) mechanically and totally disregard the legislative history, current law and equitable principles;[17] or

(2) Read § 506(c) with the legislative history as codifying current law, which this Court feels is the better view. 4B Collier on Bankruptcy, § 70.99[6] at 1224 (14th ed. 1978), indicates that the current law requires application of equitable principles:

> No one general rule can be stated that will supply all of the answers; each case must stand on its facts. In apportioning and allocating the costs and expenses incident to the sale, the bankruptcy court acts as a court of equity and any determination thereof will follow equitable principles.

See also 3 Collier on Bankruptcy, § 506.6 at 506–43 (15th ed. 1983); 48 ALR2d 1343 (1956).

In an effort to categorize and classify the application of equitable principles, the following chart sets out the post-code law as to the chargeability of § 506(c) expenses (which is based primarily on the degree of action by the lienholder):

CHART #2

§ 506(c) CHARGEABILITY

| Action by Lienholder | Under or Partially Undersecured (#1 or #2) | | Oversecured (Situation #3) | |
|---|---|---|---|---|
| | Preservation and Sale | General Administrative (Operating) | Preservation and Sale | General Administrative (Operating) |
| A. Sale Requested or Agreed [18] | Yes [18] | Yes [18] | Yes [18] | Yes [18] |
| B. Express Consent [19] | Yes [19] | Yes [19] | Yes [19] | Yes [19] |
| C. Implied Consent [20] | Yes [20] | Yes [20] | Yes [20] | Yes [20] |
| D. Active Opposition or Objection [21] | Yes [22] | No | No [23] | No [23] |
| E. Interference with Sale [24] | Yes | Yes | Yes | Yes |
| F. Other Equitable Factors Considered [25] | Varies | Varies | Varies | Varies |

Cir.1943); *L. Maxcy, Inc. v. Walker,* 119 F.2d 535 (5th Cir.), cert. den., 314 U.S. 647, 62 S.Ct. 90, 86 L.Ed. 519 (5th Cir.1941); *Odendahl v. Pokorny Realty Co.,* 76 F.2d 271 (5th Cir.1935); *Lerner Stores v. Electic Maid Bake Shops,* 24 F.2d 780 (5th Cir.1928); *In re Hagin,* 21 F.2d 434 (5th Cir.1927); *Phoenix Blvd. & Homestead Assoc. v. Carrere's Sons,* 33 F.2d 563 (5th Cir.1929), cert. den. 281 U.S. 726, 50 S.Ct. 240, 74 L.Ed. 1143 (1929); *Gugel v. New Orleans Nat. Bank,* 239 F. 676, 39 Am.B.R. 160 (5th Cir.1917); *In re Elmore Cotton Mills,* 217 F. 808 (D.C.Ala.1914).

**17.** It is to be noted that if the mechanical view is applied in the OVERsecured situation, an expressly consenting or sale requesting lienholder could not be charged with any § 506(c) expenses, which clearly would be inequitable and would not follow the Congressional intent.

**18.** 4B Collier, supra, at 1232–34 (14th ed. 1978); Annot., 48 ALR2d 1343 at 1355, 1367; *In re Hotel Assoc.,* 6 B.R. 108, 2 CBC2d 1162 (Bkrtcy. E.D.Pa.1980) [After granting lienholder's motion for appointment of trustee in Ch. 11, Court charged undersecured lienholder with prospective general operating administrative expenses].

**19.** 4B Collier, supra, at 1227 (14th ed. 1978); 3 Collier, supra, at 506–45 (15th ed. 1983); *In re*

*Modern Mix, Inc.,* 18 B.R. 746 (Bkrtcy.S.D.Ala. 1982) [Where expenses charged to one expressly consenting lienholder, but as against another non-consenting lienholder, no expenses charged—consent being the determining factor].

**20.** 4B Collier, supra, at 1227 (14th ed. 1978); 3 Collier, supra, at 506–45 (15th ed. 1983); 48 ALR2d 1343, § 11 at 1362.

**21.** 3 Collier, supra, at 506–46 (15th ed. 1983); 4B Collier, supra, at 1239 (14th ed. 1978). There is a fuzzy line between implied consent and active opposition as lienholders frequently file futile objections for show purposes only in an attempt to avoid being charged with expenses, where in reality, they recognize that the Trustee will realize a much larger amount of liquidation—thereby impliedly consenting. 4B Collier, supra, at 1241 (14th ed. 1978). *Textile Banking Co. v. Widener,* supra, (the present law according to legislative history) charged the undersecured lienholder over active opposition with preservation and sale expenses but not general operating expenses. This is contra and apparently overrules the 5th Circuit cases, n. 16,

## APPLICATION OF LAW TO FACTS

■ The Court concludes that strong equitable factors and principles in this case favor some charge of § 506(c) preservation and sale expenses because of:

(1) The particular types of collateral—Accounts Receivable. Accounts Receivable were collected by the Trustee, where some 64 adversary proceedings were instituted against creditors (including $3,840 in court costs of $60 each), as direct expenses. The collectibility of the accounts receivable was enhanced by the ability of the Trustee to use the "home-court" rule of 28 U.S.C. § 1473(a), which the Trustee contends was for the benefit of the secured creditor. In contrast, if the secured creditor had to file separate suits, it would have had to file suits all over the United States.

(2) The particular type of collateral—Inventory. The Trustee claims $9,826 for crates in packaging the inventory for shipment and $5,110 for consulting fees and commissions in sale of the inventory—both as direct expenses.

(3) The intertwining and intermixing of collateral. Here, M–H had three different items as collateral—Accounts Receivable of Central, Inventory of Central, and Accounts Receivable of Southeastern. The Trustee sold the Accounts Receivable of Southeastern to U.S. Pipe as a part of the ongoing business, so that it would have

been awkward if not impossible for the secured creditor to separate the accounts receivable and collect separately on the same.

(4) M–H benefited from the Trustee's liquidation as M–H proposed to sell the inventory of Central with a book value of $1,804,138.21 at $75 per ton scrap-iron prices for $169,575.00 (See testimony of Philip Pollack at adequate protection hearing, AP # 81–645 and AP # 81–646). The Trustee actually realized some $1,051,564 on the sale of the inventory as fittings and pipe.

Applying equitable principles to the facts, the Court makes a final determination to:

(a) Charge M–H as an impliedly-consenting oversecured creditor on A.R. & I. with the pro-rata part (37.20%) of the DIRECT expenses of $18,772.50, equals $6,983.37, which is to be set off against their § 506(b) claim.

(b) Charge FAB–M as an impliedly-consenting oversecured creditor on A.R. & I. with the pro-rata part (17.89%) of the DIRECT expenses of $18,772.50, equals $3,358.40, which is to be set off against their § 506(b) claim.

(c) NOT make any charge to M–H and to FAB–M as an impliedly-consenting oversecured creditor on A.R. & I. for general operating expenses.

supra, which held that even a consenting lienholder cannot be charged any expenses.

A minority of courts, particularly in the 2nd, 5th and 7th Circuits, have held that chargeability is limited by the cost of foreclosure in state court. This view is criticized in 4B Collier, supra, at 1234 ¶ 70.99 n. 45 (14th ed. 1978). *Textile Banking Co. v. Widener,* supra, at 454, apparently approved the cost of state foreclosure limitation (or proviso). In any event, in the case *sub judice,* this questionable limitation is inapplicable as there was no evidence presented as to the cost of a state foreclosure.

**22.** Preservation and sale expenses chargeable to Undersecured lienholder in the following postcode cases: *In re Neu-Deli Corp.,* 19 B.R. 175 (Bkrtcy.S.D.Ala.1982); *In re Truitt,* 15 B.R. 169 (N.D.Ga.1981) [First lienholder paid in full and not chargeable pro rata]; *In re Chateau Royale, Ltd.,* 6 B.R. 8 (Bkrtcy.N.D.Fla.1980).

**23.** Preservation and sale expenses NOT chargeable to OVERsecured lienholder. *In re H.P. Tool Mfg. Corp.,* 12 B.R. 600 (Bkrtcy.E.D.Pa.1981) [Even though express agreement for sale]; *In re Robertson,* 14 B.R. 706 (Bkrtcy.N.D.Ga.1981); *In re Dyemaster,* 15 B.R. 932, 935 (Bkrtcy.W.D.N.D. 1981). Contra: *In re Elmwood Farm, Inc.,* 19 B.R. 338 (Bkrtcy.S.D.N.Y.1982).

**24.** 48 ALR2d 1343, § 13, Lien creditors interference with sale, at 1365.

**25.** *In re Jim Kelley Ford of Dundee, Ltd.,* 14 B.R. 812 (N.D.Ill.1981) [Preservation and sale expenses and general operating expenses may be charged to lienholder in Ch. 11]; *In re Codesco,* 18 B.R. 225, 6 CBC2d 395 (Bkrtcy.S.D.N.Y.1982) [Aborted Ch. 11 debtor's legal fees are not chargeable to lienholder].

(d) Charge FAB–M and/or E.D.A. as an expressly-consenting UNDERsecured creditor (FAB–M Claim # 974 for $2,332,989 and E.D.A. Claim # 193 for $2,163,120, totaling $4,496,109) on E.B. & L. of DIRECT § 506(c) expenses of $138,910.79.

(e) Charge FAB–M and/or E.D.A. as an expressly-consenting UNDERsecured creditor on E.B. & L. the pro-rata part of the general operating expenses of $329,137.38.

Inasmuch as the ACTUAL expenses are still unknown at this time (the above claims by the Trustee were based upon *projected* expenses), the Court will set a hearing to allocate the amount of charges after the Trustee makes his Final Report of actual expenses and the above actual charges will be adjusted accordingly after a further hearing.

## CONCLUSION

The Court makes a final determination as to § 506(b) and the equitable principles to charge the lienholder under § 506(c) [but being an interlocutory determination as to the actual amount of the § 506(c) charges, which must await further hearing]. See *Borg-Warner Acceptance Corp. v. Hall,* 685 F.2d 1306 (11th Cir.1982).